### WALTER KIDDE CONSTRUCTORS, INC., ET AL. *v.* STATE OF CONNECTICUT

SUPERIOR COURT     JUDICIAL DISTRICT OF     FILE No. 210983
HARTFORD-NEW BRITAIN AT HARTFORD

Memorandum filed March 30, 1981

*Alcorn, Bakewell & Smith,* for the plaintiffs.

*Carl R. Ajello,* attorney general, *Harry W. Hultgren,* assistant attorney general, and *Richard M. Feingold,* special assistant attorney general, for the defendant.

HOUSE, J., STATE REFEREE. The plaintiffs in this action, hereinafter referred to as Kidde-Briscoe, formed a joint venture consisting of two large construction contractors who combined to bid for the construction of the state hospital and outpatient clinic buildings which together with the medical and dental schools comprise the Connecticut health center located in Farmington. Kidde-Brisco submitted the only bid for the construction of the hospital and outpatient buildings of the complex and on January 7, 1969 was awarded the contract to construct those buildings for the finally negotiated sum of $35,784,737.77.

The buildings which comprise the health center are curvilinear in shape, completely surrounding a center courtyard. When the contract was awarded to Kidde-Briscoe to build the hospital and outpatient portions of the health center the state had previously let to another contractor, Lasker-Goldman, a contract to build the medical-dental school portion of the complex around the opposite side of the courtyard. That contract had been let in 1967 and Lasker-Goldman was still engaged in that construction.

Kidde-Briscoe started construction in March 1969 with the expectation that it would be completed in 1100 days, ending March 6, 1972. The contract provided that in the event construction should not be completed within the 1100 days, Kidde-Briscoe would

be liable for a penalty of $2500 for each day that construction ran beyond the 1100 days. As it turned out, construction required more than 1977 days and the project was not substantially completed until August 9, 1974. What happened during that period is what gave rise to the present action in which the plaintiffs seek damages of $40,000,000.

On August 6, 1976, Kidde-Briscoe, pursuant to the provisions of § 4-61 of the General Statutes, filed a notice of claim with the state declaring its intention to bring suit for damages suffered as a result of the conduct of the state during performance of the building contract. This notice was followed by the writ, summons and complaint filed in the present action, dated April 27, 1977. As amended by a substituted complaint in 21 counts the complaint alleged in the first 12 counts that Kidde-Briscoe and its subcontractors were damaged by the state's breaches of its contract, by the state's improper retention of security which Kidde-Briscoe had posted for the proper performance of the contract, by the state's failure to pay for extra and additional work performed at the state's direction over and above that required by the contract, plans and specifications and, especially, by the state's delay in making payments due as the work progressed, by the state's failure to deliver to Kidde-Briscoe the construction site and give it access to the site for an unreasonably long period of time beyond the date on which Kidde-Briscoe was required by the contract to commence work, by providing Kidde-Briscoe and its subcontractors with defective, inadequate and incomplete plans and specifications, by issuing "hold orders" which remained in effect for inordinately long periods of time, thereby delaying and disrupting the progress of the work, by failing to process change order proposals in a prompt and timely manner, by permitting interference with Kidde-Briscoe's work by the general contractor who was erecting the medical-

dental building, by unreasonably and improperly ordering acceleration of Kidde-Briscoe's work schedule, by failure to approve shop drawings in a timely manner, by unreasonably and improperly forcing Kidde-Briscoe to perform work out of sequence, and by failure to make reasonable and timely inspections and reasonable efforts promptly to resolve disputes.

In counts 13 through 20 the complaint alleged that as to the subcontractor named in the particular count that subcontractor had filed a claim against Kidde-Briscoe in a specified amount for damages due that subcontractor for the state's breaches of the contract as alleged by Kidde-Briscoe in the preceding counts, that Kidde-Briscoe was liable to the subcontractor for that sum and there was due Kidde-Briscoe from the state for itself and on behalf of the subcontractor the specified amount plus the overhead and profit due Kidde-Briscoe under the contract.

The 21st count of the substituted complaint repeated the plaintiffs' basic claim, predicated on the theory of quantum meruit.

By way of answer to the substituted complaint the state denied any improper conduct on its part and any liability to Kidde-Briscoe or the subcontractors. By way of special defenses the state pleaded a defense of sovereign immunity to the quantum meruit count and the counts regarding the claims of the 8 named subcontractors on the grounds that they were not "disputed claims" under the contract and hence not proper claims for determination under the provisions of General Statutes § 4-61, that there are no provisions in the contract or in § 4-61 permitting a claim for breach of contract as alleged by Kidde-Briscoe in the 12th count, that, as to the counts regarding the 8 subcontractors, the state had no liability as to those subcontractors who were not parties to the contract with the state and who had signed lien waivers waiv-

ing all liens and claims against the state, "its premises and property and against the Contractor," and had signed agreements with Kidde-Briscoe which released Kidde-Briscoe from all claims and demands except the obligation to prosecute the subcontractor's claim against the state and pay over to the subcontractor such money as Kidde-Briscoe might recover, retaining a portion to reimburse it for the submission and prosecution of the claim and Kidde-Briscoe's contract percentage of overhead and profit. By way of an 11th special defense the state pleaded that the contract between itself and Kidde-Briscoe "has remained in full force and effect from its execution until the present time." A 12th special defense pleaded that all the damages alleged by the plaintiffs were due to Kidde-Briscoe's failure to exercise reasonable judgment and expertise in carrying out the contract. A 13th special defense alleged in substance that Kidde-Briscoe assumed the risk that Lasker-Goldman would not vacate the work site but would continue to occupy and use portions of it. A 14th special defense alleged that articles 25 and 26 of the general conditions of the contract and article 39 (c) of the supplementary general conditions provide for the rendering of decisions and interpretations concerning the contract documents and the performance of work and that such interpretations and decisions must be obtained in writing before the contractor could make a claim and that since the complaint did not allege compliance with these requirements the causes of action as alleged in the complaint "are premature and not properly before this Court."

In addition to the answer and special defenses the state also filed a counterclaim in which it listed 54 change orders totaling $571,454.59 which the state had paid to Kidde-Briscoe on Kidde-Briscoe's claim for specific work and materials furnished over and above the contract requirements, because of job con-

ditions, errors and omissions in the plans and specifications and changes in the work. Although each change order was approved for payment by the commissioner of public works, the counterclaim alleges that none of the payments should have been made because the payments in fact involved disputed claims which required, in each instance, the approval of the attorney general before payment and, furthermore, did not in fact involve extra and additional work for which additional compensation was required to be paid. The counterclaim sought repayment on the ground that Kidde-Briscoe was unjustly enriched by the payments.

In response to the pleadings of the state, Kidde-Briscoe denied each of the material allegations of the state's 14 special defenses and the allegations of the counterclaim, and to the counterclaim pleaded 6 special defenses including estoppel on the basis of the approval by the commissioner of public works or his authorized agent for payment of each item listed, that payments were made pursuant to the provisions of the basic contract, accord and satisfaction, the statute of limitations and release and waiver.

The foregoing brief summary of the pleadings on which the parties finally reached readiness for trial after exhaustive discovery, disclosure and deposition-taking is an indication of the multitude of complex and contested issues to be resolved by trial. The parties agreed upon referring the case to a state referee and it was referred to this referee for hearing and judgment. The trial required 113 trial days over a 13-month period and involved the testimony of 44 witnesses recorded in 16,015 pages of transcript and the admission into evidence of 1395 numbered exhibits many of which were further subnumbered or sublettered or marked by the containing box.

Without attempting to discuss every one of the multitude of questions, issues and arguments involved

in the trial, this memorandum of decision will attempt to articulate the basis of the decision reached as to the controlling and decisive factual and legal issues involved and the conclusions reached as to the claims of law raised by the parties. (Practice Book § 3060B.)

Hindsight indicates that the genesis of many of the problems giving rise to this controversy was the passage in 1963 of Special Act 362 which authorized the issuance of bonds for the construction of a medical-dental school. The act provided that the trustees of the University of Connecticut should have "full and complete responsibility for the expenditures of and accounting for funds realized from" the bond issue and expressly removed from the commissioner of public works the authority which he would have had under the provisions of General Statutes § 4-126 to select an architect and an engineering firm for the project. It expressly provided that for this project "[n]otwithstanding the provisions of § 4-126 of the General Statutes, said trustees shall select architects and other professional services for said medical-dental school." Pursuant to this authority the trustees retained the firm of Vincent Kling and Associates of Philadelphia as architects for the project and that firm in turn selected the mechanical and electrical engineers and structural consultants. While the trustees subsequently relinquished their authority over the actual administration of construction and expenditure of funds and that responsibility was turned over to the state public works department, conflict and friction ensued instead of cooperation between the university's selected architect and the public works department when it became administrator of the project.

Without reviewing in detail the evidence submitted by the plaintiffs, it is found and concluded that the plaintiffs have by a fair preponderance of the evidence

proved the basic allegations of several counts of their complaint.

The allegations of the first count have been proved except that the finally negotiated contract price was $35,784,737.77 and not $35,769,732.77 as alleged. The $35,784,737.77 has been paid by the state. The plaintiffs are entitled to the return of the securities valued at $100,000 which were posted in lieu of retention under the terms of the contract.

In counts 2 through 10 Kidde-Briscoe seeks compensation for extra and additional work which it and its subcontractors were required to perform beyond that called for or required by the contract, plans and specifications. It appears that most of those additional work claims were adjusted between the parties before trial and evidence was submitted only as to the claims pleaded in count 3 for additional work in the amount of $18,586 done by Acme-Libby, which was the mechanical-work subcontractor, and count 4 for additional work in the amount of $179,674 done by Freedman-Nager, which was the electrical-work subcontractor.

The extra work performed by Acme-Libby consisted of 9 separate items of work done over and above that called for by the plans and specifications. That performed by Freedman-Nager was the installation of additional temporary lighting which involved miles of additional cable and about 5000 additional light bulbs. While the question as to whether any of this work by either subcontractor was beyond that required by the plans and specifications was strongly contested, it is concluded that it was in fact extra and additional work beyond that required by the plans and specifications and the defendant is liable to the plaintiffs on those two claims. *Casey* v. *McFarlane Bros. Co.*, 83 Conn. 442, 76 A. 515 (1910). No evidence was submitted to prove the allegations pleaded in counts 5 through 10 and they were not proved.

In counts 11 and 12 Kidde-Briscoe pleaded that the state had breached its contract with it in several specific particulars to its great detriment and damage. Without reviewing in detail the evidence submitted by the plaintiffs to prove their allegations it is found and concluded that by a fair preponderance of the evidence, the basic allegations of those counts have been proved. More particularly it is found that the state breached its contract with the plaintiffs: (1) it failed to deliver the construction site and give Kidde-Briscoe access to the site for an unreasonably long period of time after the date on which Kidde-Briscoe was required by the contract to commence its work; (2) it failed to give Kidde-Briscoe access to the courtyard over a designated 40 foot access strip for an unreasonably long period of time after the date on which Kidde-Brisoce was required by the terms of the contract to commence its work; (3) it issued "hold-orders" to Kidde-Briscoe which remained in effect for inordinately long periods of time while the state redesigned the work in question, thereby delaying and disrupting the progress of the work which Kidde-Briscoe had contracted to perform; (4) it failed to process change order proposals in a prompt and timely manner; (5) it permitted interference with Kidde-Briscoe's work by the general contractor engaged in the construction of the medical-dental school; (6) it failed to approve shop drawings in a timely manner; (7) it failed to make timely and reasonable inspections; (8) it required Kidde-Briscoe to perform work out of sequence and unreasonably ordered and required acceleration in Kidde-Briscoe's work schedule; (9) it unreasonably and improperly withheld progress payments due Kidde-Briscoe; (10) it failed to cooperate promptly in the correction of such defective, inadequate and incomplete plans and specifications as were discovered during the course of the work.

It is found and concluded that as a result of those breaches of the construction contract on the part of the state, Kidde-Briscoe was required to perform work on the project significantly more expensive and difficult than and different from that originally required by the contract documents and plans and specifications and over a significantly longer period of time. It was required to increase the amount of the payment for the performance bond above the sums originally required by the original contract, and to maintain personnel and equipment on the project for a period of time substantially longer than reasonably planned and scheduled. By the state's detention of the money due it, Kidde-Briscoe was also damaged by the loss of use of that money to which it was entitled.

In connection with these findings it is pertinent to note certain of the significant circumstances and situations which were disclosed by the evidence.

As soon as Kidde-Briscoe was assured of receiving the contract and because of the complexity of the undertaking and the requirements of the contract documents, it prepared a detailed work schedule using the critical path method setting out on a lengthy chart more than 2000 separate construction activities so scheduled that the construction would be completed within the 1100 days called for by the contract. Revised in some details to include suggestions from the state's architect, it was approved by him and on March 3, 1969 Kidde-Briscoe moved onto the site to commence its work. Within one week of Kidde-Briscoe's commencement of construction it became apparent that essential unrestricted access to its courtyard area of construction, which it expected to have in accordance with the contract plans and specifications, was not available to it. Instead, that area within Kidde-Briscoe's contract limit lines was occupied by the equipment, material and personnel of Lasker-Goldman in connection with the con-

struction of the medical-dental buildings. Lasker-Goldman was substantially behind schedule in its own construction and continued to occupy the courtyard area for the location and operation of its cranes, trucks and storage of debris and material for virtually the entire first two and a quarter years of Kidde-Briscoe's operations. Because access to the courtyard was precluded by Lasker-Goldman's continued presence there, Kidde-Briscoe was compelled to erect the courtyard side of the building it was erecting by the use of oversized cranes and booms working from the opposite side of the building and by literally trundling many parts of the building over from one side to be installed on the other. The state's chief of construction on the project likened the process to trying to build a bridge from one side and testified: "I don't think it's a way any contractor would have figured the job." This resulted in substantial inefficiencies, delays, loss of productivity and increased costs to the plaintiffs. Not only did the contract documents expressly allocate use of the courtyard to Kidde-Briscoe during construction but such allocation was implied from the circumstances. It is implied " 'that the contractor shall be permitted to proceed with his construction in accordance with the contract and that he shall be given possession of the premises to enable him to do so.' " *Hartford Electric Applicators of Thermalux, Inc.* v. *Alden,* 169 Conn. 177, 182, 363 A.2d 135 (1975).

Kidde-Briscoe's claims with respect to its exclusion from the courtyard and the consequences of that were paraphrased by the state itself in its own pleadings in the fourth count of its counterclaim in a suit against the state brought by Lasker-Goldman. There the state expressly alleged that Lasker-Goldman had sole and exclusive use and occupancy of the "future court" area from June 20, 1967 until April 1, 1969 and that it was required to "vacate the 'future court' area on

April 1, 1969," but in breach of its contractual obligations continued to occupy the area until May 1971 "during which time it created and maintained a large dirt mound in the area, it kept large cranes and stored materials and piled up debris in the area, and it drove huge trucks, erected hoists and unloaded supplies in the area, all in violation of the conditions and terms of its contract." The state, making in that case the same claim which it now denies in this action against it, pleaded that "[t]he said acts of [Lasker-Goldman] relating to the occupation and use of said courtyard areas resulted in delays in the construction of the buildings under the phase 'C' contract." The phase "C" contract was the state's contract with Kidde-Briscoe.

The plan of construction, adopted by Kidde-Briscoe and detailed in the critical path schedule which it adopted with the approval of the architect for the project, called for excavation to begin for the foundation of the seven story hospital building and to proceed through the location for the outpatient building as far as a 40-foot path which was to be used for access to and from the courtyard until about March 1, 1970 when the path was also supposed to be vacated by Lasker-Goldman. Once excavation for the hospital building was completed construction of that building was planned to proceed rapidly so that that structure could be "topped out" by the first winter on the job and be enclosed within 17 months. The mechanical and electrical subcontractors were scheduled to "rough-in" their work immediately after Kidde-Briscoe began its excavation and concrete work, and they were to be followed by the other trades through to the "finishing trades" such as painters and carpet installers. Because of the sequential nature of such work it is obvious that a suspension or stoppage of any material phase of the construction work would necessarily delay the succeeding phases of the work since, for ex-

ample, a stoppage or suspension of the plumbing work necessarily stops or delays the work of the mason who is scheduled to construct the block wall around that plumbing.

The delays which the plaintiffs encountered were too many to enumerate separately in a memorandum such as this. Aside from being prevented from erecting the courtyard side of the outpatient building by working from the ground up on that side and, instead, having to erect it by the use of cranes and booms operating over the opposite outside wall, as previously noted, the most damaging single delay arose from the state's "hold" order on the so-called "high-density concrete" radiation treatment rooms.

Those rooms were located on the ground floor of the outpatient clinic building and were designed to house radiation treatment equipment. To prevent leakage of radiation from the rooms, they were designed to have their walls constructed of a denser than normal aggregate. Before construction began the university learned of a change in the state of the art in this field. This development required the purchase of radiation treatment equipment different from that originally planned. In turn this required a change in the configuration of the treatment rooms. On October 21, 1969 the public works department notified Kidde-Briscoe that "a Hold is herewith initiated deferring the installation of concrete foundations, walls and column footings" for the treatment rooms. Not until over a year later, on November 2, 1970, did the state finally and completely release its hold order. In the meantime Kidde-Briscoe was required to construct around the treatment rooms using expensive and extraordinary construction techniques, in effect leaving in the middle of the building a hole shaped like an inverted pyramid around which it had to use extensive shoring and step back the concrete pours. Not until 18 months after the "Hold" order was placed was

Kidde-Briscoe able to proceed with the construction of the ground floor high-density rooms and the surrounding area. The damages resulting from this delay, disruption and lost productivity were substantial.

During construction other problems arose. Not unexpectedly in such a large project as this errors and omissions were discovered in the plans and specifications. These obviously required clarification or correction and in many instances change orders. In the opinion of the public works department's chief of design, of the 344 change orders issued to Kidde-Briscoe during the course of construction, 154 were due to architectural design errors. Some were as simple and obvious as the discovery that according to the plans, a water line ran directly through an elevator shaft and in another instance the state's drawings called for an 8 inch fire riser pipe to penetrate an 8 inch concrete beam in a stairwell. Others were of a more complex nature requiring substantially revised plans and specifications, approval by the public works department of the architect's proposed solution, a cost proposal from Kidde-Briscoe and the issuance of a change order – all causing delays for which Kidde-Briscoe was not responsible. Typical of the lack of cooperation between the public works department and the architect, to the detriment of the plaintiffs, was the instance of the 8 inch pipe running through the 8 inch beam. Until the solution to the conflict was decided Kidde-Briscoe had to hold up pouring concrete in the area. The architect corrected the error with a "field directive" widening the beam in question and Kidde-Briscoe immediately notified the public works department in writing that to avoid delay in pouring the concrete for the stairwell it would follow the instructions of the architect and record the related costs. While this might have appeared to be a reasonable solution it was not acceptable to the public

works department whose then chief of construction replied by letter the next day: "This is to inform your office that all job instructions relating to any part of the work must come from the Public Works Department. Orders emanating from any other source will not be recognized by the Public Works Department." The intransigence and lack of cooperation on the part of then public works department personnel prompted the architect to protest to the state's attorney general that the position of the department was "jeopardizing the State's position in a potential litigation proceeding" and that "the insistance by the Public Works Department personnel in literally following the letter of the book has proven to be extremely cumbersome and on the Phase (C) project it has brought the change order and decision making process to a complete impasse."

The plaintiffs also amply proved their allegation that the state "unreasonably and improperly withheld progress payments due Kidde-Briscoe" to the latter's financial harm and detriment. The contract price exceeded not only the state's estimates of the cost of the project but also the total funds then appropriated, including the entire 5 percent contingency fund of $1,597,111. Time and again the public works department's chief fiscal officer repeated urgent pleas for funds to meet the state's obligations. Due to the department's delay in approving the schedule of values submitted by Kidde-Briscoe, it and the subcontractors at the start proceeded with the construction for nearly 6 months and expended nearly $2,000,000 without receiving any progress payment whatsoever from the state. To the department's repeated requests for immediate funding to pay Kidde-Briscoe, the state's finance and control commissioner responded on July 31, 1974 with the reply: "There are no funds available. How do you propose to finance these change orders?"

The plaintiffs were entitled to reasonably prompt payment by the state in accordance with the provisions of the contract but the public works department did not have funds available to make payment. In all, the public works department issued to Kidde-Briscoe 344 change orders, adding to or deleting from the contract work. It classified 38 of the changes as due to "Agency Requests," 154 due to "Architectural errors and/or omissions" and the remainder as due to "Job Conditions." Some of the changes were major, such as those making changes in the radiation treatment rooms and in the complicated Cyberail transport system during the course of construction and in providing additional backboxes for consoles in the patients' rooms when those rooms were already well along in construction. In the circumstances the public works department although directing Kidde-Briscoe to proceed on hundreds of thousands of dollars of changed or additional work delayed the issuance of formal change orders without which Kidde-Briscoe could not obtain payment. Much of the work was not paid for by the state until 1974 when charges for specific work involved were reviewed by the public works department and Kidde-Briscoe and funds were finally made available to pay for them. It is concluded that the plaintiffs clearly have proved the essential allegations of their complaint as to the liability of the state to them for damages.

In reaching this conclusion the special defenses pleaded by the state have not been overlooked. They have not been proved.

The plaintiffs have vigorously stressed the adverse inferences which may be drawn from the failure of the state to produce evidence from many witnesses who were available, were closely involved in the construction project and had personal knowledge of the relevant facts. They point to the fact that no one from the architect's firm or the engineering firm was called by

the state to testify, nor any one from the University of Connecticut, the using agency, whose physical plant directors actually occupied offices on the job site during construction, nor were some of the top personnel of the public works department, the chief of construction, the chief of design and review, the chief of cost review or the construction supervisors – all individuals who were closely identified with the project on behalf of the state and would be expected to support the state's allegations of incompetence and default on the part of Kidde-Briscoe if the allegations were true. The rule restated in *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 675, 165 A.2d 598 (1960) is clearly applicable in such instances: " 'The failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him permits the inference that the evidence of the witness would be unfavorable to the party's cause.' " "A witness who would naturally be produced by a party is one who is known to that party and who, by reason of his relationship to that party or to the issues, or both, could reasonably be expected to have peculiar or superior information material to the case which, if favorable, the party would produce." Regardless of whether such inferences should be drawn here, the fact remains that the burden of proof as to the affirmative special defenses alleged by the defendant rested with the defendant and as to the state's allegations in its 12th and 13th special defenses relating to Kidde-Briscoe's performance of the contract and alleged assumption of risk, that burden has not been sustained by the evidence produced by the state. Little testimony of help to the state was produced by the state from witnesses who had any personal knowledge of what happened during the course of construction and, in fact, only 4 of the 18 witnesses who were called by the state had any on-site contact with the project. The testimony of the state's expert witnesses who testified as to what happened or should

have happened during the course of construction and with the benefit of hindsight expressed opinions as to what should have been done or not done was in every case substantially weakened by the witnesses' lack of knowledge of what the true facts were and consequent reliance upon facts which the witnesses assumed as bases for their opinions but which in many instances were not true and were not proved.

In its first two special defenses the defendant claimed that § 4-61 of the General Statutes does not permit a plaintiff to bring an action against the state for a determination of the claims set out in the 11th through 21st counts of the plaintiffs' complaint. This assertion on the part of the state is found to have no merit so far as the Kidde-Briscoe joint venture is concerned. By the provisions of § 4-61 the state has waived the defense of sovereign immunity in such cases as this arising out of contracts with the state "for the design, construction, repair or alteration of any state . . . building or other public works." The waiver permits "any party" to a public works contract with the state of Connecticut to bring suit for the determination of "any disputed claims under such contract." The claims asserted by Kidde-Briscoe are such claims. It was so held by the court *(D. Shea, J.)* in ruling on the defendant's earlier demurrer. See also *Contracting & Material Co.* v. *City of Chicago*, 20 Ill. App. 3d 684, 314 N.E.2d 598 (1974). This court concurs in Judge Shea's decision.

By counts 13 through 20, plaintiffs Kidde-Briscoe seek to recover from the state "delay damages" (as distinguished from compensation for extra and additional work) allegedly caused to 8 of their subcontractors. The total damages claimed by the 8 subcontractors are substantial, amounting to over $6,000,000. Before considering the specific allegations of those counts it is appropriate to note the circumstances

under which a prime contractor may sue for and recover damages sustained by a subcontractor. The conditions precedent to the prosecution of such a suit have been the subject of much discussion and judicial consideration. See *United States* v. *Blair,* 321 U.S. 730, 64 S. Ct. 820, 88 L. Ed. 1039 (1944); *Continental Illinois National Bank & Trust Co.* v. *United States,* 112 Ct. Cl. 563, 565, 81 F. Sup. 596 (1949); *Severin* v. *United States,* 99 Ct. Cl. 435 (1943), cert. denied, 322 U.S. 733, 64 S. Ct. 1045, 88 L. Ed. 1567 (1944); *Wexler Construction Co.* v. *Housing Authority,* 144 Conn. 187, 128 A.2d 540 (1956) and 149 Conn. 602, 183 A.2d 262 (1962); Penne, "Legal Remedies of the Government Subcontractor," 32 S. Cal. L. Rev. 1, 9 (1958); Whelan & Gnoss, "Government Contracts: Subcontractors and Privity," 10 William & Mary L. Rev. 80 (1968).

In Connecticut the law now appears to be well settled. Since "it is a fundamental concept of judicial administration that no person is entitled to set the machinery of the courts into operation unless for the purpose of obtaining redress for an injury he has suffered or to prevent an injury he may suffer, either in an individual or representative capacity" and "a contractor is not necessarily, nor even generally, liable to its subcontractor for the extra work done by the subcontractor by reason of fault on the part of the owner or his agents," proof of the liability of the prime contractor to the subcontractor is a prerequisite to recovery by the prime contractor for an injury alleged to have been sustained by the subcontractor. *Wexler Construction Co.* v. *Housing Authority,* 149 Conn. 602, 605, 183 A.2d 262 (1962). It is not enough in an action by the prime contractor that that contractor proves that a subcontractor who is not a party to the suit and was not a party to the prime contract may or does have a cause of action against the other party to the prime contract. *Knapp* v. *New Haven Road Con-*

*struction Co.,* 150 Conn. 321, 324, 189 A.2d 386 (1963). "A plaintiff can recover only by proving that he himself is entitled to prevail on the cause of action alleged. It is not enough that he prove that some other person, not a party to the case, would be entitled to recover on that cause of action." *Wexler Construction Co.* v. *Housing Authority,* supra, 605.

It was in recognition of this rule of law that the court *(D. Shea, J.)* sustained the demurrer of the defendant to the portion of Kidde-Briscoe's original complaint which did not allege liability of Kidde-Briscoe to the subcontractors for damages claimed to have been caused to the subcontractors by the alleged breaches of contract by the defendant state. It was subsequent to this decision and obviously a result of it that in the substituted complaint the relevant counts were amended to allege in each of the counts 13 through 20 not only that the particular subcontractor had presented to Kidde-Briscoe a claim for a specific amount of delay damages allegedly caused by the state's breaches of contract but also that Kidde-Briscoe itself was liable for those damages. By way of answer to those allegations the defendant pleaded no knowledge, leaving the plaintiffs to their proof. In addition the defendant pleaded by way of special defenses to each of the counts.

As to each subcontractor named in counts 13 through 20 except Freedman-Nager named in count 14 the defendant pleaded that the subcontractor had executed and delivered to the plaintiffs an affidavit and waiver of lien which contained a provision that the subcontractor "hereby waives all liens and claims against the said owner, its premises and property, and all claims against the Contractor." It is the claim of the defendant that by virtue of this document and the statements therein contained neither the state nor Kidde-Briscoe is liable to the waiving subcontractors for any claims arising out of the construction project.

By way of further special defense the defendant pleaded as to each subcontractor except Acme-Libby in count 13, Freedman-Nager in count 14 and Mario & DiBono in count 20 that the contract between Kidde-Briscoe and the individual subcontractor contained an express provision that Kidde-Briscoe should not be liable to the subcontractor for "any delay caused by us, by the Owner, by other contractors, or for any other cause whatsoever."

By way of further special defense the defendant pleaded as to each count 13 through 20, involving each of the subcontractors, that Kidde-Briscoe and the individual subcontractor had entered into a "liquidating agreement" by which the subcontractor expressly released Kidde-Briscoe from all demands and claims it had against Kidde-Briscoe except for (a) the obligation of Kidde-Briscoe to submit and prosecute on behalf of the subcontractor a claim against the state for the reasons stated in the agreement, and (b) the obligation to pay to the subcontractor a portion of such monies as it might receive from the state by reason of that submission and prosecution. Those individual agreements also provided that Kidde-Briscoe was to receive and retain for itself a portion of the monies received from the state by reason of the submission and prosecution of the claim.

It is found that the state proved the truth of each of the factual allegations contained in these special defenses.

Counts 13 through 20 setting forth the claims of the individual subcontractors for delay damages allegedly caused to them are in the same language except for the names of the individual subcontractors and the amount of damages claimed by each. The first 8 paragraphs of each count set out the existence and general terms of the contract between Kidde-Briscoe and the state. The allegations of paragraph 9 of the 11th count of the complaint are then made paragraph

9 of each of the 8 counts. The specific allegations of this paragraph, although lengthy, are of sufficient importance to be repeated here–with emphasis supplied:

"9. During the course of construction of said project by Kidde-Briscoe and its subcontractors, *the State breached said contract in that:*

(a) *It* failed to deliver the construction site and give Kidde-Briscoe access to said construction site for an unreasonably long period of time after the date upon which Kidde-Briscoe was required by said contract to commence its work;

(b) *It* failed to deliver to Kidde-Briscoe and give Kidde-Briscoe access to the "forty-foot strip," so-called, for an unreasonably long period of time after the date upon which Kidde-Briscoe was required by said contract to commence its work;

(c) *It* provided Kidde-Briscoe and its subcontractors with defective, inadequate and incomplete plans and specifications for the construction of said buildings;

(d) *It* issued "hold orders" to Kidde-Briscoe, which remained in effect for inordinately long periods of time while the State redesigned the work in question, thereby delaying and disrupting the progress of the work which Kidde-Briscoe had contracted to perform;

(e) *It* failed to process change order proposals in a prompt and timely manner;

(f) *It* permitted interference with Kidde-Briscoe by another general contractor on another phase of said construction project;

(g) *It* unreasonably and improperly ordered acceleration in the work schedule of Kidde-Briscoe;

(h) *It* failed to approve shop drawings in a timely manner;

(i) *It* unreasonably and improperly forced Kidde-Briscoe to perform work out of sequence;

(j) *It* failed to make timely inspections;

(k) *It* failed to make reasonable efforts to promptly resolve disputes;

(l) *It* failed to properly administer the contract;

(m) *It* unreasonably and improperly withheld progress payments due Kidde-Briscoe;

(n) *It* actively and unreasonably interfered with Kidde-Briscoe's performance of its work under the contract;

(o) *It* acted unreasonably in ordering, requiring and directing Kidde-Briscoe to perform extra and additional work, which changes unreasonably extended the period of performance."

Following those specific allegations of breaches of the contract by the state, as to each of the 8 subcontractors, Kidde-Briscoe alleged that "[b]y reason of the State's breaches of contract as aforesaid," Kidde-Briscoe and the named subcontractor "have suffered severe financial harm and detriment" in a specified amount and that a claim in that amount has been presented to Kidde-Briscoe by the subcontractor; then, in each instance, it is expressly pleaded, "Kidde-Briscoe is liable [to the named subcontractor] for said damages."

By Kidde-Briscoe's inclusion of the express allegation that it was liable for the damages caused by the state's breaches of its contract with Kidde-Briscoe (anomalous as such a plea of mea culpa appears to be), Kidde-Briscoe satisfied the first condition precedent to successfully suing on behalf of its subcontractors–an allegation of its own liability to them for the claimed damages. But that allegation alone without supporting proof is not sufficient and the proof

necessary to support the allegation of that liability was not produced. Kidde-Briscoe did not prove the truth of the allegation of its own liability and without that proof it cannot prevail on the allegations of counts 13 through 20.

The precise terms of the "liquidating agreements" which Kidde-Briscoe entered into with its subcontractors are also significant. In each of them the only liability which Kidde-Briscoe recognized was its liablility to the subcontractor to act "as a conduit" for the presentation of the subcontractor's claim and an obligation as such a "conduit" to present that claim against the state in the present suit in consideration of which promise the subcontractor agreed never to sue or attempt to enforce any claims or demands against Kidde-Briscoe for any matter related to or arising out of the construction project.

Also in connection with the plaintiffs' allegation that they are liable to the subcontractors for the damages which they and the subcontractors claim were caused by the state and their further reliance on the holding in the first *Wexler* case–144 Conn. 187, 190, 128 A.2d 540 (1956)–that the liquidating agreement in that case did not bar a recovery by the prime contractor, it is important to note a significant difference between the subcontractor's claims in the *Wexler* case and the subcontractors' claims in counts 13 through 20 in the present case. In the *Wexler* case the subcontractor's claims were not for delay damages (as are the subcontractors' claims set out in counts 13 through 20) but were for work not called for by the plans and specifications. They therefore differ from the delay damages allegations in the present case and are instead similar to counts 3 and 4 on which liability has been found.

There is also merit to the defendant's special defense of governmental immunity from suit on the claims set out in counts 13 through 20 since waiver of

that immunity is granted by General Statutes § 4-61 only to "[a]ny person, firm or corporation which has entered into a contract with the state . . . in the event of any disputed claims under such contract." In the present case none of the subcontractors had "entered into a contract with the state" and accordingly each is barred from a suit against the state whether that suit is brought by them directly in their own names or through the "conduit" of a contractor who had entered into a contract with the state.

It is concluded for all the foregoing reasons that the plaintiffs have failed to prove the liability of the state as alleged in counts 13 through 20.

The 21st count of the substituted complaint sounds in quantum meruit. Since it has been determined that the plaintiffs have proved the existence of an express contract and a breach of that contract causing damage to the plaintiffs it is unnecessary to consider the merits of this alternative allegation as a basis for liability.

One further special defense of the defendant needs to be specifically mentioned. In its 12th special defense to the 2d through 21st counts the defendant alleged that all the damages claimed by the plaintiffs "were due to deficiency in and lack of, the exercise of reasonable judgment and expertise in the performance, execution, administration, supervision and observation of the contract and the work by the plaintiffs and/or the Kidde-Briscoe joint venture, and their agents, servants and employees, and were further due to acts and omissions on their part and on the part of their agents, servants and employees" in specific enumerated ways.

It is found that the defendant has not proved the truth of these allegations. In fact, the overwhelming credible evidence is to the contrary. Edward J. Kozlowski who was commissioner of public works

from March 1971 to February 1973 testified that the quality of the plaintiffs' workmanship was "excellent." George Pawlikowski who was construction supervisor for the public works department from May 1968 to November 1973 and district construction supervisor from November 1973 to June 1977 testified that Kidde-Briscoe "performed in a workmanlike manner" and that so far as the general contract work was concerned: "We found no problems." Thomas J. Connor who was special assistant to the commissioner of public works from May 1971 to September 1972 and from then to August 1974 chief of construction for the public works department testified that the work of the plaintiffs was "professional and competent" and that the plaintiffs "represent a high caliber type construction firm." Lawrence D. Costello who was construction supervisor for the public works department from March 1967 to September 1972, then district construction supervisor to December 1973 and since that time construction supervisor for the department testified that Kidde-Briscoe's compliance with the contract documents was "more than acceptable."

In connection with this 12th special defense pleaded by the state it is relevant to note the decision of the commissioner of public works concerning the possible assessment against Kidde-Briscoe of the $2500 a day liquidated damages provided in the construction contract for each day in excess of 1100 days it took to complete the contract. In fact, the construction to substantial completion required an additional 877 days. In January 1975, after construction had been completed, at the direction of the commissioner of public works the district construction supervisor reviewed the items of delay with field personnel. In accordance with his instructions not to consider "controversial matters" and to stop his review when and if he determined that Kidde-Briscoe was entitled to an extension of 877 days, the district construction super-

visor attributed the 877 day overrun to some 39 change orders issued by the public works department and noted that "it became apparent that the Contractor is probably entitled to some additional time." The public works commissioner upon receipt of this report and upon conferring with the chief of construction granted Kidde-Briscoe an extension of time of 877 days thereby absolving Kidde-Briscoe from any responsibility for the delay encountered.

Before turning to the plaintiffs' claims of damages, it is in order to consider the merits of the counterclaim pleaded by the defendant. The gist of the counterclaim is that Kidde-Briscoe presented to the public works department claims for extra and additional work and materials which it was required to do and furnish over and above the specific contract requirements because of job conditions, errors and omissions in the plans and specifications and changes in the work which were required by the public works department. In all, there were 54 change orders approved and issued by the public works commissioner to Kidde-Briscoe which are now challenged by the defendant in the counterclaim. They total $571,454.59. It is pleaded by the defendant (a) that the change orders issued by the public works commissioner were in fact for work which should have been done and materials which should have been furnished by Kidde-Briscoe under the contract and were not, in fact, for additional or extra work and (b) that they were in fact disputed claims the settlement of which should not have been decided by the commissioner of public works but under the provisions of General Statutes § 3-125 could only be settled under the supervision of and upon approval of the attorney general and accordingly the sum of $571,454.59 paid on account of these 54 change orders was erroneously paid, the plaintiffs were unjustly enriched by that payment and the state is entitled to restitution of that amount.

There is no merit whatsoever to this claim of the state and the assertion that none of the myriad disputed change orders issued on the many public works construction projects in which the state is engaged may lawfully be adjusted without the approval of the attorney general borders on the absurd.

Section 4-126 of the General Statutes (Rev. to 1972) specifically provided in pertinent part:

"Sec. 4-126. DUTIES OF COMMISSIONER. *The public works commissioner shall (a) be responsible for the administrative functions of construction and planning of all capital improvements undertaken by the state,* except highway and bridge construction, including the preparation of preliminary plans, estimates of cost, development of designs, working plans and specifications, award of contracts and supervision and inspection . . . . Subject to the provisions of chapter 67, *said commissioner may appoint such employees as are necessary for carrying out the duties prescribed by this chapter* . . . ." (Emphasis added.)

The contract with Kidde-Briscoe for this construction project was executed by the public works commissioner on behalf of the state. Several provisions of the contract are of special relevancy in connection with the claims asserted in the state's counterclaim:

"Article 1. DEFINITIONS: Whenever the following terms, or pronouns in place of them are used, the intent and meaning shall be interpreted as follows:

" 'Additional Work': *Work required by the Owner which in the judgment of the Public Works Commissioner involves changes in the work required in the performance of the original contract,* resulting either from changes in the plans and specifications or from conditions which either could be anticipated yet were not readily capable of definite ascertainment as to quantities, etc., or could not be anticipated, observed

or discovered until the specified work under the original contract was actually undertaken. (Emphasis added.)

. . . . .

" 'Extra Work': *Work required by the Owner, which in the judgment of the Public Works Commissioner* is work arising outside of and entirely independent of the Original Contract and not required in its performance. (Emphasis added.)

. . . . .

"Article 13. CHANGES IN THE WORK, COMPENSATION THEREFOR: The Owner may at any time, by a written order, without notice to the sureties, require the performance of extra or additional work, and upon request the Contractor shall supply the Owner with a detailed proposal for the same showing quantities of, and unit prices for his work and that of any subcontractor involved. *No such order shall be considered however, unless approved by the Public Works Commissioner or his duly authorized representative prior to its issuance.* Upon receipt of the written order the Contractor shall proceed with the work as and when directed. The amount of compensation to be paid to the Contractor for any extra or additional work so ordered shall be determined as follows . . . . (Emphasis added.)

. . . . .

"Article 25. ALL WORK SUBJECT TO CONTROL OF PUBLIC WORKS COMMISSIONER: In the performance of the work the Contractor shall abide by all orders, directions and requirements of the Public Works Commissioner, and at such time and places, by such methods and in such manner and sequence as he may require. *The Public Works Commissioner shall determine the amount, quality, acceptability and fitness of all parts of the work, shall interpret the Plans, Specifications, Contract Documents and any EXTRA WORK ORDERS, and shall decide all other questions in connection with the work . . . .*" (Emphasis added.)

The circumstances surrounding the change orders, the approval of which by the commissioner of public works is attacked by the state in the defendant's counterclaim, were explained by the testimony of public works commissioners Manafort and Kozlowski, district construction supervisor Pawlikowski and Thomas J. Connor, project manager and chief of construction for the public works department. It appears that there was "a tremendous backlog of Change Orders" which had not been processed by the public works department, owing in large part to the fact that the public works department did not have the funds to pay for the work already done pursuant to its directions. In an effort to clear the backlog a committee consisting of 3 representatives from the public works department and 3 from Kidde-Briscoe worked to determine the validity of the change orders and the proper charges for the work done. The public works department representatives assisted by representatives from the office of the architect, Henry Margolis, the chief of the cost review section of the public works department and construction supervisors checked each of the change orders to determine the validity of each, who was responsible, whether the order was due to an architect's error or the contractor's or state's error, or to job conditions, and whether the work involved was in fact required by the contract or was extra and additional work required by the state over and above that required by the contract plans and specifications. The tentative conclusions reached on each of the pending change orders as a result of this review were then processed through the regular channels of the public works department, sent to the commissioner for his review, were approved by him and ultimately paid by the public works department and accepted by Kidde-Briscoe. The defendant has not proved the truth of the allegations of its counterclaim and is not entitled to repayment of the funds paid by the state for the work done and

materials furnished pursuant to the 54 change orders challenged by the state in its counterclaim.

## DAMAGES

The plaintiffs having proved the liability of the state and the state having failed to prove the relevant allegations of its special defenses and its counterclaim, the final issue for decision is that of damages.

As were the issues as to liability, the extent of damages caused to the plaintiffs was hotly contested. Some of the damages are readily determinable but others can only be approximated. That some damages may not be proved with exactness does not preclude recovery for them. As the Connecticut Supreme Court observed in *Southern New England Contracting Co.* v. *State,* 165 Conn. 644, 661, 345 A.2d 550 (1974): "There is no unbending rule as to the evidence by which damages are to be determined, but the object of the parties ought to be attained as nearly as possible. *Lee* v. *Harris,* 85 Conn. 212, 214, 82 A. 186 (1912). 'It is incumbent upon a plaintiff in a contract action to prove his damages with all the certainty which is reasonably possible, but where exactness is not possible he is not therefore to be precluded from a recovery, and the best approximation to certainty is all that is required.' *Bartolotta* v. *Calvo,* 112 Conn. 385, 395, 152 A. 306 [1930]." See also *Story Parchment Co.* v. *Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S. Ct. 248, 75 L. Ed. 544 (1931).

### A

The plaintiffs are clearly entitled to the return of the securities which were valued at $100,000 and deposited with the defendant in lieu of the retention provided for by the provisions of the contract.

### B

The plaintiffs are entitled to payment of $218,086 for the extra and additional work done for them by

their subcontractors Acme-Libby and Freedman-Nager as discussed supra in connection with counts 2, 3 and 4.

## C

The plaintiffs are entitled to payment of $248,557 for the loss of use of the money due them for progress payments for both contract and change order work not paid by the state when due. See *Healy* v. *Fallon*, 69 Conn. 228, 235, 37 A. 495 (1897). The computation and amount were testified to by Robert Muccino, the controller for Kidde-Briscoe and analyzed and summarized in schedules D and E of his report. The state offered no contrary evidence and the analysis appears to be valid and accurate.

## D

The largest items of damages caused to the plaintiffs arise from the extended time required to complete the construction project. As previously noted, the original contract required construction to be completed in 1100 days and the critical path plan prepared by the plaintiffs was designed to meet this requirement. In fact, substantial completion of the project required 1977 days and, as has been found, the delay was due to the breaches of the contract on the part of the state as set out in count 11 of the substituted complaint. It was especially due to the failure of the state to make the courtyard and 40 foot strip areas of the construction site timely available to the plaintiffs for their work, to the express and constructive "hold orders" which substantially interfered with and disrupted and delayed construction while plans were redesigned and to the state's delays in processing the large number of change orders and approving shop drawings, all while nevertheless insisting that the plaintiffs escalate and accelerate their work under threat of imposing the $2500 per day penalty for not completing construction within the 1100 days prescribed in the contract.

The long delay in completing construction had a devastating impact on Kidde-Briscoe. It was not only required to provide labor and materials far in excess of and different from that called for in the original contract but to perform work out of sequence at an accelerated rate and in a manner not planned and not utilized under normal conditions. The unanticipated almost two and a half years of delayed construction extended through a period of increasing inflation and escalation in labor rates and material costs, through two winters with adverse building conditions and into a time when Kidde-Briscoe was faced with an 89 day regional strike by the sheet metal workers and a 137 day regional strike by the plumbers' union.

A computation of the consequent damages to Kidde-Briscoe involves damages of two sorts: (a) delay damages due to the extended periods of field and home office overhead and (b) damages due to disruption, loss of productivity, inefficiency, acceleration and escalation. Both elements of damage are well recognized as compensable delay damages recoverable by a contractor. See *Southern New England Contracting Co.* v. *State,* 165 Conn. 644, 660–63, 345 A.2d 550 (1974) and cases cited therein; see also annot., 115 A.L.R. 65, "Right of Building or Construction Contractor to Recover Damages resulting from Delay Caused by the Default of Contractee."

In proving the extent and amount of their delay damages in this case the plaintiffs carefully followed the method of proof expressly approved by the Supreme Court in the *Southern New England Contracting Co.* case, supra. It is found that here, as in that case, the method of proving this cost "was in accordance with sound and recognized accounting principles and the inherent reasonableness of the method used in light of the facts of this case." Id.,

662. "The very complexity of the issues of delay and damages herein emphasizes the practicality and fairness of the averaging method used." Id., 661.

No attempt will be made in this memorandum to summarize the research work, testimony or reports of Robert Muccino, who was the controller of Kidde-Briscoe joint venture and whose report is Exhibit P-233 or of James O'Brien of the consulting firm of O'Brien-Kreitzberg & Associates whose detailed report is Exhibit P-232. The court is satisfied that their testimony supplied "the best approximation to certainty" which is possible "where exactness is not possible." Id.

On the basis of their testimony and reports it is found that Kidde-Briscoe is entitled to delay damages of $2,883,114 for home office and field extended costs due to the delay; to $3,845,801 damages for inefficiencies, loss of productivity, escalation and acceleration caused by the delay, and $32,794 for the additional performance bond premium to cover the extended period.

In making this finding the testimony and reports of the state's expert witness, Robert Logcher of the Massachusetts Institute of Technology, have not been overlooked. While conceding that "there is substantial evidence that the owner impacted the contractor" Dr. Logcher concluded that the state was responsible for only 154 days of delay and that proper compensation for the delay damages sustained by Kidde-Briscoe amounted to only $1,302,170. The weight to be given to Dr. Logcher's calculations and opinion was seriously diminished, however, by his reliance upon obviously incomplete and inaccurate data made available to him and by his many assumptions of fact which the evidence in the case showed to be false. His testimony and opinions, under the circumstances, are not to be fully relied upon.

## E

The remaining aspect of damages to be considered is whether prejudgment interest should be awarded to the plaintiffs. The criteria for making a determination of this "vexatious question" were summarized in *Southern New England Contracting Co.* v. *State,* 165 Conn. 644, 664, 345 A.2d 550 (1974):

"This court recently had occasion to examine the issue of the awarding of interest in contract actions. ' " 'The determination of whether or not interest is to be recognized as a proper element of damage, is one to be made in view of the demands of justice rather than through the application of any arbitrary rule.' *Bernhard* v. *Rochester German Ins. Co.,* 79 Conn. 388, 398, 65 A. 134 [1906]. The real question in each case is whether the detention of the money is or is not wrongful under the circumstances." *Cecio Bros., Inc.* v. *Feldmann,* 161 Conn. 265, 275, 287 A.2d 374 [1971]; *Wells Laundry & Linen Supply Co.* v. *Acme Fast Freight, Inc.,* 138 Conn. 458, 463, 85 A.2d 907 [1952]; *Campbell* v. *Rockefeller,* 134 Conn. 585, 591, 59 A.2d 524 [1948]. Basically, the question is whether the interests of justice require the allowance of interest as damages for the loss of use of money. *Goldman* v. *Coppola,* 149 Conn. 317, 328, 179 A.2d 817 [1962]; *Wells Laundry & Linen Supply Co.* v. *Acme Fast Freight, Inc.,* supra. Whether a sum in certain circumstances has been liquidated may, of course, be a useful although not necessarily controlling criterion. *Capitol City Lumber Co.* v. *Sudarsky,* 95 Conn. 336, 340–41, 111 A. 349 [1920]; 22 Am. Jur. 2d 256, 263, Damages §§ 179, 185; cf. *Loomis* v. *Gillett,* 75 Conn. 298, 300–301, 53 A. 581 [1902]. The allowance of interest as an element of damages is, thus, primarily an equitable determination and a matter lying within the discretion of the trial court.' *Bertozzi* v. *McCarthy,* 164 Conn. 463, 466, 323 A.2d 553 [1973]."

See also the annotation in 60 A.L.R.3d 487, "Allowance of Prejudgment Interest on Builder's Recovery in an Action for Breach of Contract," and the notes in 61 Harvard Law Review 113, 116 (1947); 15 Stanford Law Review 107 (1962); and 5 U.C.L.A. Law Review 262, 268 (1958).

With full regard for the equities of the case and considerations of fairness and justice between the parties it is concluded that Kidde-Briscoe is entitled to prejudgment interest as an element of fair compensation for the damages caused to it. Compensation is a fundamental principle of damages whether the action is in tort or contract. One who fails to perform his contract is justly bound to make good all damages that accrue naturally from the breach and one who has had the use of money justly owing to another may be required to pay interest from the time the payment should have been paid when such payment is necessary in order to arrive at fair compensation. *Miller* v. *Robertson,* 266 U.S. 243, 45 S. Ct. 73, 69 L. Ed. 265 (1924); *E.I. du Pont de Nemours & Co.* v. *Lyles & Lang Construction Co.,* 219 F.2d 328, cert. denied, 349 U.S. 956, 75 S. Ct. 882, 99 L. Ed. 1280 (1955); *Campbell* v. *Rockefeller,* 134 Conn. 585, 591, 59 A.2d 524 (1948). Prejudgment interest on the damages found to be due to the plaintiffs is assessed at the statutory rate of 8 percent running from October 1, 1974 until the date of judgment. General Statutes § 37-3a.

The question as to whether court costs may be assessed against the state appears to have been definitively determined in the negative by the Supreme Court in *State* v. *Chapman,* 176 Conn. 362, 366, 407 A.2d 987 (1978). In that case the court held: "In the absence of a specific statutory provision allowing the taxation of costs against the state, this court is required to adhere to the widely recognized principle that statutes relating to costs and authorizing the im-

position of costs in various kinds of circumstances, which do not in express terms mention the state, are not enough to authorize imposing costs against the state. *State ex rel. Foote* v. *Bartholomew,* 111 Conn. 427, 150 A. 308 [1930]; annot., 72 A.L.R.2d 1399, § 9. We conclude that the general language of § 52-257 governing taxable costs does not apply to the state."

## DAMAGES SUMMARY

It is found, in summary, that by way of damages Kidde-Briscoe is entitled to:

(A) Return of the securities deposited in lieu of retention and by way of money damages

| | | |
|---|---|---:|
| (B) Payment for additional work | $ | 218,086 |
| (C) Reimbursement for loss of use of money due to late payments for both contract and change order work | | 248,557 |
| (D) Delay damages for extended office and field overhead | | 2,883,114 |
| Delay damages for loss of productivity, inefficiency, acceleration and escalation | | 3,845,801 |
| Cost of extended performance bond premium | | 32,794 |
| | $ | 7,228,352 |

together with prejudgment interest on that sum from October 1, 1974 to the date of judgment and thereafter with interest, until the judgment is satisfied.

## CLAIMS OF LAW

Presumably in accordance with the provision of the Practice Book § 285A the defendant requested the court "to make a determination" on 7 "questions of law." It is believed that this memorandum of decision

already includes the court's conclusion as to each specific question asked but assuming that the "questions" should be treated as "claims of law" as that term is used in Practice Book § 3060B, they are again briefly answered here:

1. Are the plaintiffs entitled to bring an action for breach of contract under § 4-61 of the Connecticut General Statutes? Answer: Yes.

2. Are the plaintiffs entitled to maintain an action on behalf of the subcontractors who have no contracts with the defendant? Answer: No, under the pleadings and proof submitted in this case.

3. Under the terms of the contract or the provisions of § 4-61 of the General Statutes are the plaintiffs entitled to damages for the alleged delay in the performance of the contract? Answer: Yes.

4. Are the plaintiffs entitled to interest and costs as claimed under the contract or § 4-61 of the General Statutes? Answer: Yes, as to interest. No, as to costs.

5. Are the plaintiffs entitled to a claim for damages for extra and additional work when such work is permitted specifically by the contract? Answer: Yes, when the claim is for compensation for performing the extra and additional work.

6. Is the defendant entitled to make a claim for reimbursement which it alleges were [sic] improperly approved? Answer: Yes.

7. Are the plaintiffs entitled to maintain an action in quantum meruit under the terms of § 4-61 of the Connecticut General Statutes? Not answered because the question is academic, the plaintiffs having alleged and proved liability under an express contract.

It is particularly appropriate in a case which is as complex and time-consuming as this has been and

which has required careful research, presentation, briefing and argument on the part of counsel, that the court express its appreciation for the patience, cooperation and assistance of counsel and commend them for their diligence and the high quality of their work in the professional representation of their respective clients.

Judgment may enter in accordance with the provisions of this memorandum of decision.