AIRCRAFT GEAR CORPORATION,
Plaintiff,

v.

KAMAN AEROSPACE CORPORATION,
Defendant.

No. 93 C 1220.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 5, 1995.

Richard Reichstein, Chicago, IL, Steven A. Kaufman, Boston, MA, for plaintiff.

John C. Yavis, Jr., Everett E. Newton, Hartford, CT, Aaron E. Hoffman, Chicago, IL, for defendant.

## MEMORANDUM OPINION
## AND ORDER

SHADUR, *Senior District Judge.*

Aircraft Gear Corporation ("Aircraft") has sued Kaman Aerospace Corporation ("Kaman"), seeking damages for the alleged breach of a subcontract under which Aircraft supplied steel gears for helicopters that Kaman manufactured for the United States Navy. Kaman has in turn filed a Counterclaim to recover amounts that it incurred as a result of Aircraft's claimed deviations from the original Manufacturing Orders and Purchase Orders under the subcontract.

Following dismissal of its original Complaint on summary judgment, Aircraft has now moved for leave to file an Amended Complaint ("AC") under Fed.R.Civ.P. ("Rule") 15(a), asserting that its original Complaint had inadequately set forth its claims against Kaman. In addition, Aircraft has moved under Rule 56 for summary judgment on Kaman's Counterclaim. For the reasons stated in this memorandum opinion and order, Aircraft's motion for leave to file the AC is granted in part but denied in principal part, while its motion for summary judgment on the Counterclaim is denied.[1]

### Aircraft's Amended Complaint
*Procedural Background*

Aircraft filed its single-count breach of contract Complaint on February 26, 1993. Aircraft asserted there that Kaman had breached its contractual duty to provide specifications instructing Aircraft on how to heat treat helicopter gearbox components. As a result, Aircraft claimed $1.8 million in extra expenses by way of additional work and outlays to finish the job.

After the case was at issue and substantial discovery had taken place, Kaman moved for summary judgment on Aircraft's Complaint (but not on Kaman's own Counterclaim).

That motion was briefed extensively, and on June 13, 1994 this Court granted Kaman's motion for summary judgment and dismissed the Complaint in the "Opinion," 856 F.Supp. 446.[2] Holding that the key determination as to the scope of Kaman's contractual undertaking posed a question of law, the Opinion determined that the parties' contract was manifestly of the "performance" variety and that Aircraft alone was responsible for the cost overruns.

On June 20 Aircraft filed a "motion for reconsideration," requesting this Court to revisit its Opinion. Aircraft's position was that this Court had erred in reading the Complaint to reach only Pyrowear gears instead of *all* gears for which Kaman had contracted. Kaman was given the opportunity to oppose both the filing of the motion and Aircraft's substantive arguments. Before Kaman could respond, however, Aircraft filed yet another motion—this one purporting to seek the alteration or amendment of a judgment under Rule 59(e). On June 27 this Court denied the latter motion (1994 U.S.Dist. LEXIS 9018), pointing out that such motions were wholly inapropos where as here no final order had been entered.

■ After Aircraft and Kaman then adhered to the original briefing schedule on the motion for reconsideration, this Court denied that motion orally. Although Aircraft ascribed its loss on summary judgment to "poor presentation," this Court concluded (Aug. 8, 1994 Tr. 5):

> Both Kaman and the Court were entitled, I find, to rely on the plain meaning of the Complaint as defining the scope of the claim. And the evidence that was tendered on the summary judgment motion was insufficient to create a material factual issue, which is of course why the Complaint was properly dismissed and remains dismissed.

---

1. Given the nature of the two motions at issue here (one dealing with a claim by Aircraft and the other dealing with a claim by Kaman), it would be potentially confusing to employ the usual "P." and "D." shorthand designations for Aircraft as plaintiff and Kaman as defendant. Instead "A." and "K." will be used to denote Aircraft and Kaman respectively. And to distinguish between the sets of briefs on the two mo-

tions, this opinion will use "AC" and "SJ" (the latter standing for "summary judgment," of course).

2. Citations to the Opinion will take the form "Opinion at —," listing the page but omitting the F.Supp. volume number.

But in light of Kaman's pending Counterclaim, Rule 54(b) rendered that dismissal a nonfinal order as such. Moreover, the interrelationship between the parties' opposing claims foreclosed consideration of the entry of a Rule 54(b) direction for the entry of judgment on Aircraft's claim alone.

*Rule 15(a) Principles*

■ Under Rule 15(a) parties may amend their pleadings, after a responsive pleading has been served, only with leave of court. Leave to amend "shall be freely given when justice so requires" (Rule 15(a)), but such grants are not automatic (*Johnson v. Methodist Medical Ctr. of Ill.,* 10 F.3d 1300, 1303 (7th Cir.1993)). Instead the decision on whether "justice so requires" is committed to the discretion of the district judge (*Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971)), to be determined on the basis of the factors set forth in *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962):

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

■ Rule 15(a) has as its purpose "to enable a party to assert matters that were overlooked or were unknown at the time he interposed the original complaint or answer"

(6 Charles Wright et al., *Federal Practice & Procedure: Civil 2d* § 1473, at 520 (2d ed. 1990)). Once summary judgment has been entered and a plaintiff's complaint has been dismissed, the plaintiff seeking leave to amend before entry of an adverse final judgment must therefore either explain why the "new" theory was not advanced at an earlier time or risk denial of the motion as untimely (*Humphreys v. Roche Biomedical Lab., Inc.,* 990 F.2d 1078, 1081–82 (8th Cir.1993); *Shipner v. Eastern Air Lines, Inc.,* 868 F.2d 401, 407 (11th Cir.1989); *Union Planters Nat'l Leasing, Inc. v. Woods,* 687 F.2d 117, 121 (5th Cir.1982); *Scottish Air Int'l v. British Caledonian Group, PLC,* 152 F.R.D. 18, 30 (S.D.N.Y.1993)). *Freeman v. Continental Gin Co.,* 381 F.2d 459, 469–70 (5th Cir.1967) explains the conceptual basis for that approach:

> Much of the value of summary judgment ... would be dissipated if a party were free to rely on one theory in an attempt to defeat a summary judgment and then, should that theory prove unsound, come back long thereafter and fight on the basis of some other theory.

> We hold that a district court does not abuse its discretion in refusing to allow amendment of pleadings to change the theory of a case if the amendment is offered after summary judgment has been granted against the party, and no valid reason is shown for the failure to present the new theory at an earlier time.[3]

As *Thompson v. Boggs,* 33 F.3d 847, 853 (7th Cir.1994) has more recently said, quoting *Johnson:*

> There must be a point at which a plaintiff makes a commitment to the theory of its case.

> > It is true that the original theory of the Federal Rules of Civil Procedure was that the plaintiff ought to be permitted to fumble around searching for a meritorious claim within the elastic boundaries of a barebones complaint until the final pretrial conference. No judge or lawyer in this age of crowded dockets takes that completely seriously and in any event it is not reversible error for the judge to insist that a separate claim be made the subject of a separate suit, especially when the original claim was ripe for judgment.

**3.** [Footnote by this Court] Aircraft has argued that it need not have specified a legal theory in its Complaint, but need only have alleged facts sufficient to support a claim. So much is true in the context of initially testing the sufficiency of a complaint under Rule 12(b)(6) (*Tolle v. Carroll Touch, Inc.,* 977 F.2d 1129, 1134 (7th Cir.1992)), but it distorts that notion to extend it past the time when a Rule 56 motion has been fully documented, briefed and decided. That state of events goes well beyond the situation spoken of in *Chaveriat v. Williams Pipe Line Co.,* 11 F.3d 1420, 1430 (7th Cir.1993):

*Proposed Count I*

■ AC Count I goes far beyond the assertions of the original Complaint to which Kaman responded in its motion for summary judgment and on which this Court ruled in the Opinion. Aircraft's breach of contract claim alleges that Kaman ordered over 300 engineering changes that forced Aircraft to incur added costs and experience delays. Whereas the original Complaint had spoken in terms of modifications relating to the manufacture of Pyrowear gears (Complaint ¶ 13), this time the proposed language says that the "directed changes were almost entirely concerned with aspects of the manufacturing processes unrelated to the heat treatment of Pyrowear gears" (AC ¶ 15).

■ Aircraft's delay in filing its motion to amend by way of AC Count I must be characterized as "undue." Aircraft was clearly aware of the scope of its claim from the very beginning. In fact, Aircraft relies even now on the same submissions that it tendered to this Court to oppose summary judgment. In addition, Aircraft can point only to what its Reply Memorandum in support of its earlier motion seeking "reconsideration" of the Opinion termed the "errors of the lawyer" (R.Mem. 3) to explain its failure to bring the claim earlier. It is well settled, however, that a client may not avoid dismissal merely because of the negligence of its freely selected agent (*Daniels v. Brennan*, 887 F.2d 783, 788 (7th Cir.1989)).

In terms of prejudice to Kaman, our Court of Appeals' decision in *Johnson* offers a valuable basis for comparison. There the plaintiff was denied the opportunity to amend her complaint after defendant had filed a motion for summary judgment—and even *before* the district court had decided that motion. In affirming that denial *Johnson*, 10 F.3d at 1304 said:

First, the preceding complaints made very specific allegations, thus focusing the issues narrowly; it was not unreasonable for

Methodist to be taken by surprise by the proposed complaint's new allegations. Second, Methodist moved for summary judgment based on the allegations contained in the second amended complaint, which if granted (as here), removes Methodist from this action. Third, it seems likely that Methodist, as it contends, would have to engage in substantial additional discovery and thus be prejudiced if plaintiff's proposed complaint were accepted. If amendment were permitted, Methodist's success in defeating all the claims in the second amended complaint would not end the lawsuit, and it would have to engage in a new contest on different issues—four years after the action was started.

Here (as in *Johnson*) Aircraft originally focused the issues much more narrowly than its AC would seek to do. And here (unlike *Johnson*) this Court had already fully resolved those issues *against* Aircraft when the proposed amendment was tendered—a factor that surely entitles Aircraft to less favorable treatment (and a fortiori to no more favorable treatment) than the plaintiff in *Johnson*.[4] If it had not been for Kaman's Counterclaim, this action would have been fully concluded before Aircraft presented its new version of its own claim. It would work a rank injustice on Kaman to punish it because it has a substantial claim against Aircraft—to treat it *less* favorably than a defendant that has no potential claim of its own, but is seeking only to avoid the imposition of liability.

That conclusion is buttressed by the added factor that allowing such an amendment would drastically increase the scope of the events at issue and, in so doing, would force upon Kaman the burden of additional discovery. Despite Aircraft's claims to the contrary (its AC Mem. 3), Kaman has represented to this Court that it has completed discovery and has been ready to go to trial on its Counterclaim since June 1994 (June 22, 1994 Tr. 10).[5] Even so, were such additional dis-

---

**4.** See *Figgie Int'l, Inc. v. Miller*, 966 F.2d 1178, 1181 (7th Cir.1992).

**5.** Aircraft does not seem to recognize the anomaly inherent in its arguing forcefully that *both* parties will have to engage in the same discovery

for the Amended Complaint as will be required by the Counterclaim (A. AC Mem. 2–3). In making that argument Aircraft implicitly assumes that its motion for summary judgment on Kaman's counterclaim will be *denied*. When coupled with Aircraft's blatant disregard for other

**490**

covery capable of easy completion, this Court might be content to accept what may be Aircraft's offer to cover Kaman's expenses related to such discovery (A. AC Mem. 12), as this Court has done on occasion in the past (see, e.g., *National Union Fire Ins. Co. v. Continental Ill. Corp.,* 658 F.Supp. 781, 791 (N.D.Ill.1987)).[6] But Kaman has provided evidence that a significant number of the employees with knowledge of Aircraft's gear development phase have left the company (K. AC Mem. 11–12). To be sure, that situation might simply create greater difficulty and expense (rather than actual impossibility) in completing discovery (depending on whether the whereabouts of the departed personnel are still known), but that cannot be said of the irreparable prejudice caused by the fact that at least one Aircraft officer has died (K. AC Mem.Ex. CC, Ken Spurgeon Dep. 277).[7]

Aircraft knew the scope of its potential claims from day one. Having chosen to pursue one line of attack in its Complaint, and having lost on summary judgment, Aircraft now seeks a second bite of the apple. That bite is denied.

*Proposed Count II*

■ Where Kaman was originally charged with ordering several hundred changes, Kaman would now be subjected to suit under AC Count II for demanding that certain changes suggested by Aircraft *not* be made.[8] But unlike the already-discussed situation involving AC Count I, Aircraft cannot claim that it always intended to assert this "constructive changes" theory and that it was only through the inadvertence of its lawyers that it failed to do so. Rather Aircraft has

Rule 56 principles (more on that later), that line of argument thus draws into question Aircraft's good faith in connection with the filing of its Rule 56 motion.

**6.** This opinion refers to "what may be Aircraft's offer" because Aircraft's latest submission leaves it unclear (A. AC Mem. 8 n. 7):

Kaman also has not argued that it will incur any additional costs as a result of proceeding on Aircraft's amended complaint. Therefore, Aircraft should not be required to reimburse Kaman for any such costs if this motion is granted.

**7.** Kaman further claims that the former chief metallurgist William Goodwin has also passed

simply thought up a new theory to replace the one that failed on its first attempt. Under the standards already discussed, leave to file AC Count II must be denied.

*Proposed Count III*

■ AC Count III claims that Kaman breached its contract in July and August 1993 when it wrongfully terminated four Purchase Orders based on Aircraft's asserted default in performance. Aircraft alleges that Kaman waived its right to terminate those Purchase Orders when it encouraged Aircraft to continue performing under the Purchase Orders after Kaman had knowledge that Aircraft had already missed certain deadlines (AC ¶ 42). Furthermore, Aircraft argues, the delays cited by Kaman were all excusable under the terms of the Purchase Orders and therefore failed to justify Kaman's termination of those four Orders (*id.* ¶ 43).

AC Count III is distinguishable from AC Counts I and II in one critical respect: Kaman had not terminated the four Purchase Orders at the time that Aircraft filed its Complaint—instead the termination took place some six months later. In those circumstances, it is profitable to look at what the situation in this action would have been if there had been no Kaman Counterclaim. In that event this Court's order granting Kaman's motion for summary judgment would have been a final order. And Aircraft would not then have been barred by claim preclusion from bringing its now-tendered AC Count III as a separate action—such preclu-

away (K. AC Mem. 11), but none of the evidentiary documents tendered to this Court speaks to that question.

**8.** AC Count II focuses exclusively on the Pyrowear gears, framing Kaman's refusal to allow certain modifications regarding heat treatment of Pyrowear gears as "constructive changes" that trigger the Changes Clause contained in the Purchase Orders (AC ¶¶ 11, 54) and seeking reimbursement for the extra costs involved. Aircraft claims that it informed Kaman of the "commercially unsustainable production yields and unusually high discard rates it was experiencing" (*id.* ¶ 26), but that Kaman insisted that Aircraft follow certain manufacturing processes followed by Kaman's other subcontractors (*id.* ¶ 28).

sion does not apply to bar a lawsuit brought to vindicate rights allegedly violated after the filing of the original Complaint (see *Spiegel v. Continental Ill. Nat'l Bank,* 790 F.2d 638, 645–46 (7th Cir.1986)).

But this Court's order granting Kaman summary judgment was *not* a final order. And that fact alone presents this Court with the option of allowing Aircraft to file the unbarred claim at this late stage. As between such filing in this case and requiring Aircraft to bring a separate action, judicial economy favors Aircraft's request—AC Count III asserts the wrongful termination of four Purchase Orders for delay, while Kaman's Counterclaim sues for damages claimed to be due from some of those same delays. In fact, given the current rejection of Aircraft's other proposed claims as well as the earlier summary judgment decision dismissing its original claims, the posture of this action is no different from one in which Kaman had sued Aircraft in the first instance (rather than via Counterclaim) and Aircraft had responded with a counterclaim of the nature presented in AC Count III. In that situation there is no question that Aircraft's "counterclaim" would have been allowed.[9]

In sum, AC Count III stands in a wholly different light from AC Counts I and II. Neither justice nor economy would be served by denying Aircraft's motion to amend its Complaint in that respect. Aircraft is therefore granted leave to file AC Count III.[10]

*Kaman's Counterclaim*

*Summary Judgment Principles* [11]

■ Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose, this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) and cases cited there).

This District Court's General Rule ("GR") 12(m) and (n) respectively require the submission of factual statements in support of and in opposition to Rule 56 motions. Aircraft complied with those rules by filing a GR 12(m) statement (cited "A. 12(m) ¶ —"). Kaman in turn filed what it calls a GR 12(n) statement (cited "K. 12(n) ¶ —").[12] Although the latter submission presents well over 100 paragraphs of additional material facts, Kaman fails to respond to each numbered paragraph in Aircraft's statement as required by GR 12(n). Our Court of Appeals has consistently taken the same approach that this Court has employed ever since it first moved its colleagues on this District Court to adopt GR 12(m) and (n): GR 12(n) submissions may be strictly construed even where the

---

**9.** Kaman does claim that Aircraft should not be allowed to assert that claim because it would be futile. Specifically Kaman points to AC ¶ 40:

> Prior to the issuance of the termination notices, Kaman knew that Aircraft had missed scheduled deliveries and was not making progress toward meeting schedules.

It is true that if Aircraft had actually halted production on the four Purchase Orders in question, Kaman would appear to have been within its rights to terminate those contracts even if it had previously waived the delivery schedules (see *A.B.G. Instrument & Eng'g, Inc. v. United States,* 593 F.2d 394, 403–04, 219 Ct.Cl. 381 (1979) (per curiam)). But Aircraft's acknowledgement that it "was not making progress toward meeting schedules" may or may not be equivalent to the situation dealt with in *A.B.G.* At least this threshold stage, without all the relevant evidence in hand, is not the point at which to cut off Aircraft's claim on that basis.

**10.** This ruling is predicated on the assumption that minimal discovery will be required on the AC Count III claim, so that the trial of Kaman's Counterclaim (on which, it will be recalled, Kaman has said it is ready for trial) will not be delayed materially. If on further submission it were to appear that such is not the case, the balance would shift in favor of moving this case toward swift resolution (calling for dismissal of AC Count III without prejudice, so that Aircraft could file a new lawsuit to be tried separately).

**11.** Even though this section of the text covers a portion of the same ground as the original Opinion, it is repeated so that this opinion can be self-contained.

**12.** This opinion also contains a few "K. 12(m)" citations. Those refer to materials submitted in connection with Kaman's original summary judgment motion (the one that was granted in the Opinion).

parties have not engaged in the type of willful conduct that might trigger a default judgment (*Johnson v. Gudmundsson,* 35 F.3d 1104, 1108 (7th Cir.1994)). Consequently all factual assertions claimed and adequately supported by Aircraft will be accepted as true in this opinion (*Stewart v. McGinnis,* 5 F.3d 1031, 1034 (7th Cir.1993)).[13]

*Facts* [14]

■ On or about December 15, 1986 Kaman entered into a contract with Aircraft under which Aircraft agreed to manufacture certain gears and parts required by Kaman (A. 12(m) ¶ 4). Those terms were memorialized in a Purchase Order drafted by Kaman (*id.*). At issue in Kaman's Counterclaim are six such Purchase Orders totalling $3,004,716 (*id.*).

Each of the Purchase Orders between Aircraft and Kaman incorporated these provisions (among others) by reference (A. 12(m) ¶ 6): [15]

4. CHANGES. (a) Kaman may at any time by written order to Vendor [Aircraft] and without notice to sureties, if any, make changes within the general scope of this order in any one or more of the following: (1) shipping and billing instructions; (2) quantity of supplies ordered; (3) drawings or specifications; (4) delivery schedules; and (5) place of delivery.

(b) Vendor shall proceed promptly to make such changes in accordance with the terms of Kaman's written order. If any such change causes an increase or decrease in the cost of performance of this order, or in the time required for performance, an equitable adjustment shall be made in purchase order price or the delivery schedule or both and this order shall be amended in writing accordingly. Any claim by Vendor for adjustment under this clause shall be asserted within thirty (30) days after the date of the written order effecting change. In the absence of such notification Kaman shall not be obligated to consider Vendor's claim for an equitable adjustment resulting from the change, and in no event shall Kaman be obligated to consider any claim for an increase in price after final payment to Vendor hereunder. . . .

\* \* \* \* \* \*

10. EXCUSABLE DELAYS. (a) Vendor shall not be charged with any liability for failure or delay in making deliveries when such failure or delay is due to any cause beyond the control and without the fault or negligence of Vendor; provided that Vendor shall give to Kaman prompt notice in writing when it appears that such cause will delay deliveries under this order. If any such failure or delay shall threaten to impair Kaman's ability to meet delivery requirements for its products or to meet other contractual obligations, Kaman shall have the right, at its option and without being under any liability to Vendor, to cancel by notice in writing to Vendor the portions of this order so affected.

(b) Kaman shall be excused for failure or delay in its performance herein due to any cause beyond its reasonable control and without its fault or negligence.

As contemplated by just-quoted Purchase Order ¶ 4, from time to time Kaman directed Aircraft to make changes to the contract requirements through the use of Engineering Orders (A. 12(m) ¶ 7). Many of those changes related to deletions, conflicts and

13. In a conference call with both parties on December 21, 1994, one of this Court's law clerks made certain that its chambers files contained all of Kaman's GR 12(n) submissions. Kaman's attorneys indicated then, and later confirmed by letter dated December 22, that they did not intend to respond to Aircraft's GR 12(m) statement but chose instead to rely on the claimed inadequacies of Aircraft's submissions.

14. What follows in this section of the text includes only those facts necessary for resolution of Aircraft's Rule 56 motion for summary judgment. Because Aircraft did not dispute any of the additional material facts submitted by Kaman, the factual summary borrows freely from K. 12(n) where there is no conflict with A. 12(m).

15. Aircraft's citation to "Amended Complaint, ¶ 11" (A. 12(m) ¶ 6) in support of this point and at least five other assertions in its GR 12(m) motion can be given no weight at all because of the obvious fact that none of the cited paragraphs in the AC has been admitted (see Rule 56(c)). Where evidentiary sources have been properly adduced and cited, however, the contention will stand.

omissions of pertinent data from Kaman's drawings and specifications (*id.* ¶ 8).

Aircraft's performance under the contracts was delayed by as much as 1,369 days past the delivery dates stated in the contracts (dates that began June 30, 1989) (*id.* ¶ 12). When Aircraft's gears finally did arrive, in some cases Kaman was able to complete and ship aircraft that incorporated the gears in as few as 18 days after receiving them (*id.* ¶ 11).

Originally the parties' contract ran from October 1, 1986 to October 31, 1989 (*id.* Ex. B at 2). But Kaman encouraged Aircraft to perform under the successive contracts even after 1989—Kaman provided 3,837 man-hours in engineering services to assist Aircraft from 1990 through 1992 (*id.* at 7). Meanwhile Kaman coped without the Pyro-wear gears by (1) borrowing gears from another Navy program, (2) employing other "limited life" gears that it later replaced, (3) employing steel gears from another manufacturer for testing purposes and (4) assembling the aircraft out of sequence, all at a substantial cost (A. 12(m) ¶ 14; *id.* Ex. B at 14–15).

Aircraft's motion for summary judgment presents three principal issues: (1) its own liability for delay damages, (2) Kaman's entitlement to certain other claimed damages and (3) Kaman's asserted failure to state a claim with sufficient particularity. Those issues will be visited in turn.

*Delay Damages*

Kaman claims that it suffered damages by way of escalation costs, manufacturing disruption and overhead due to Aircraft's delay in delivering the gears. Aircraft responds with three arguments. First, Aircraft contends that Kaman waived the contract schedule for delivery of the gears, making the delivery of "late" gears an impossibility. Second, Aircraft says that even if Kaman did

not waive delay damages, Aircraft was either excused or entitled to an equitable adjustment under the contract. Third, Aircraft urges that Kaman has failed to state a claim for unabsorbed overhead damages. But as will be seen, Aircraft comes up short on all fronts.

1. *Waiver*

 In support of its waiver position, Aircraft cites *DeVito v. United States,* 413 F.2d 1147, 188 Ct.Cl. 979 (1969) (per curiam). But *DeVito* stands only for the proposition that unless a contracting party terminates the contract within a reasonable time after non-performance by another party, the performing party waives the right to terminate.[16] As Kaman rightly points out, its claim for delay damages does not involve the right to terminate the contracts at issue here (K. SJ Mem. 17)—instead, having *accepted* the tendered gears, Kaman merely seeks damages for their delayed delivery.

 Kaman's having accepted the gears well after the contract delivery dates does not of itself bar Kaman's recovery of damages for the delay (see Gilbert Cuneo, *Waiver of the Due Date in Government Contracts,* 43 Va.L.Rev. 1, 23–28 & n. 115 (1957), collecting authorities; 6 Samuel Williston, *Treatise on the Law of Contracts* § 856, at 231 (Walter Jaeger ed., 3d ed. 1962); 2 E. Allen Farnsworth, *Farnsworth on Contracts* § 8.19, at 456 (1990); Restatement (Second) of Contracts § 246 cmt. b (1979); 17A Am. Jur.2d *Contracts* § 624, at 633 (2d ed. 1991)). But Aircraft—choosing to ignore this Court's prior holding (Opinion at 451 n. 12) on the inapplicability of the Connecticut UCC[17]— asserts that Kaman should nonetheless be barred from recovery because of its failure to

---

**16.** For a discussion of where *DeVito* would apply, see Harry Dorsey, *The Government's Right To Terminate for Default: A Death Knell for Cure Notice Requirements in Service Contracts?,* 111 Mil.L.Rev. 167, 201–05 (1986).

**17.** Though the Opinion, *id.* provided the citation to an Illinois case concerning mixed contracts by way of example in its prior opinion, it is clear that Connecticut follows the same approach (see *Myrtle Mills Assoc. v. Bethel Roofing, Inc.,* No.

29–87–34, 1993 WL 382305, *2, 1993 Conn.Super. LEXIS 2379, at *4–*6 (Conn.Super.Ct. Sept. 14); *Gulash v. Stylarama, Inc.,* 33 Conn.Supp. 108, 364 A.2d 1221, 1223–24 (Ct.1975)). In any event, citations to the Connecticut version of the UCC (found in Conn.Gen.Stat.Tit. 42a and carrying a section number that tracks the UCC) will simply take the form "Conn. UCC § —" omitting "42a" and reflecting only the UCC number).

comply with the UCC's requirements (A. SJ R.Mem. 7–8).[18]

Conn. UCC § 2–607(3) would be the relevant provision if the UCC applied here (as it does not):

> (3) Where a tender has been accepted (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.... [19]

Under the majority view, that section applies to claims of late delivery as well as other breaches (*Eastern Air Lines, Inc. v. McDonnell Douglas Corp*, 532 F.2d 957, 973 (5th Cir.1976), collecting authorities; John Reitz, *Against Notice: A Proposal To Restrict the Notice of Claims Rule in U.C.C. § 2–607(3)(a)*, 73 Corn.L.Rev. 534, 544 n. 32 (1988); 4 Ronald Anderson, *Uniform Commercial Code* § 2–607:17, at 129 (3d ed. 1983)).

But there is no corresponding requirement of notice as a prerequisite to recovery in a non-UCC transaction—one that does not predominantly involve the sale of goods. And so Aircraft's contention on that score fails (although this Court, out of an abundance of caution, has reviewed the parties' evidentiary submissions and has found that disputed factual issues would preclude summary judgment even under Aircraft's UCC-based theory).

In sum, there is no rule of law barring Kaman's recovery on waiver grounds. And even if the parties' contracts had been subject to the Connecticut UCC (as they were not), there would be a genuine issue of material fact as to whether Kaman complied with the notice requirements of Conn. UCC § 2–607(3).

### 2. *Excusable Delay and Equitable Adjustment*

Aircraft is liable to Kaman for failing to deliver the gears on schedule only if the delays were unexcused (K. 12(m) Ex. K

(Conditions of Purchase) ¶ 10). Aircraft contends that (1) some of Kaman's delays were attributable to causes other than those attributable to Aircraft and (2) some of the delays were caused by Kaman's additional Engineering Orders (a factor that would trigger a contract provision entitling Aircraft to equitable adjustments in the delivery schedule). Neither position prevails as a matter of law.

■ As an initial matter, Aircraft's claims under this heading are flawed in a manner that offers cumulative justification for their rejection on the present motion: Neither argument, if successful, would dispose of an entire claim by Kaman. As this Court has observed repeatedly, such issue-narrowing excursions are not the proper province of Rule 56 motions (see, e.g., *Turley v. American Builders & Contractors Supply Co.*, No. 93 C 7838, 1994 WL 319274, 1994 U.S.Dist. LEXIS 8533 (N.D.Ill. June 24, 1994); *Arado v. General Fire Extinguisher Corp.*, 626 F.Supp. 506, 508–09 (N.D.Ill.1985); *SFM Corp. v. Sundstrand Corp.*, 102 F.R.D. 555, 558–59 (N.D.Ill.1984)). And while this Court may sometimes in its discretion convert piecemeal approaches to summary judgment into Rule 16 issue-narrowing motions (*Turley* at *2 n. 2, 1994 U.S.Dist. LEXIS 8533, *2 n. 2), even a brief review of Aircraft's position on excuse and equitable adjustment reveals that such a conversion would hardly be productive here.

For one thing, Aircraft urges that is entitled to judgment because "Kaman experienced delays in performing its prime contracts with Navy due to causes other than shipments of gears from Aircraft" (A. 12(m) ¶ 11). Kaman freely admits as much: Though the T700 R & D program was delayed a total of 2,098 days, Aircraft is charged with causing only 836 days of that total, and the SH–2G Block Upgrade delays are similarly adjusted (A. 12(m) Ex. B at 3–

---

**18.** Opinion at 451 visited the choice-of-law issue and held that while Connecticut law controlled the issues arising out of the contract, federal law provides guidance where Connecticut law is nonexistent, sparse or otherwise inconclusive. Under the law of the case doctrine, that prior determination controls here as well (see *United States v. Thomas*, 11 F.3d 732, 736 (7th Cir.1993)).

**19.** [Footnote by this Court] Under Conn. UCC § 2–714 damages are made available to a plaintiff meeting those requirements.

4). But Aircraft does not contend that it lacked responsibility for *all* of the delays, and it fails to suggest how the other contributing factors entitle it to disavow all responsibility for any part of Kaman's claims.

As for the portion of the delays that Aircraft attributes to a strike at its facility, Aircraft has tendered a February 6, 1992 letter by an officer of Kaman acknowledging (with respect to an unrelated proceeding) that Aircraft had been on strike since August 3, 1990 (A. 12(m) Ex. A Tab M). But even assuming arguendo (1) that the letter is admissible as an admission by Kaman that it knew of the strike and (2) that the strike constituted excusable delay, Aircraft has still failed to establish the absence of a genuine issue of material fact on the matter. Even if those things were true, Kaman has properly supported its claim for damages flowing from delays *before* the August 1990 strike (K. 12(n)(2) Ex. U (Herbert Gewehr Aff.) ¶¶ 1–9). And more fundamentally, Aircraft's claim that the "same strike of course delayed the parts at issue here" is not only wholly unsubstantiated (see A. SJ Mem. 8) but is deficient in two other respects:

1. Aircraft has not shown that it gave "prompt notice in writing" that the strike would delay delivery of the gears—a precondition to any *excused* delay under the parties' contract (K. 12(m) Ex. K (Conditions of Purchase) ¶ 10).

2. Aircraft's failure to have raised the claim as an affirmative defense under Rule 8(c) renders it vulnerable on waiver grounds (see, e.g., *Bank Leumi*, 928 F.2d at 235 and cases cited there).

Finally, Aircraft argues that Kaman's directed changes are responsible for "a portion of the delays in its deliveries" (A. SJ R.Mem. 12). But Aircraft has failed even to suggest that it laid claim to an equitable adjustment within the 30–day period mandated by the contract (K. 12(m) Ex. K (Conditions of Purchase) ¶ 4). And while strict adherence to such notice provisions may sometimes be waived in light of the parties' conduct (see, e.g., *Copco Steel & Eng'g Co. v. United States*, 341 F.2d 590, 598–99, 169 Ct.Cl. 601 (1965) (per curiam)), here the parties' contract contains a vital phrase not present in *Copco* (K. 12(m) Ex. K (Conditions of Purchase) ¶ 4):

> In the absence of such notification Kaman shall not be obligated to consider Vendor's claim for an equitable adjustment.

In any case, Aircraft has certainly not proved any waiver by Kaman as a matter of law.

In sum, Aircraft's three arguments under this heading are totally inappropriate components of a Rule 56 motion. In light of the piecemeal nature of its attack on Kaman's Counterclaim, no single argument would be dispositive, and even when taken together the arguments would still leave gaps. Most importantly, because a Rule 16 determination would also be fruitless on the facts, it is enough to find that summary judgment could not be predicated on Aircraft's claims even if they were shown to be true (as they have not been).

### 3. *Unabsorbed Overhead: The Eichleay Formula*

In asserting that Kaman is not entitled to recover unabsorbed overhead, Aircraft once again seeks to chop down a single tree in the forest—an effort that is wholly inappropriate under Rule 56. But even were this Court otherwise prepared to entertain the argument, it too is flawed in several respects.

■ Overhead is commonly defined as "those costs which are expended for the benefit of the business as a whole and which usually accrue over time" (*Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1578 (Fed.Cir.1994)). Overhead costs are therefore not directly attributable to specific contracts, for if they were they would constitute direct costs (*id.*). Nevertheless, contractors typically assign a percentage of their overhead costs to each project's costs to cover such indirect costs as home office salaries, supplies, utilities and rent (Glen Darbyshire, Note, *Home Office Overhead as Damages for Construction Delays*, 17 Ga.L.Rev. 761, 761 (1983)).

In the event of contract changes or other unforeseen developments resulting in delay, however, a contractor's usual method of allocating overhead costs to projects may no longer adequately reflect the overhead costs

properly allocable to a specific project (2 John McBride et al., *Government Contracts* § 23.110[11], at 23–116 (1994)). If a project is delayed, the contractor may not be able to take on new contracts that would otherwise help absorb the overhead expenses accruing during the delay, thus giving rise to "unabsorbed overhead" (*id.;* Darbyshire, 17 Ga. L.Rev. at 768–70).

If the contractor cannot mitigate its damages, the otherwise unabsorbed overhead occasioned by the delay may be recovered from the party causing the delay on the basis of a fair proration (*Southern New England Contracting Co. v. State,* 165 Conn. 644, 345 A.2d 550, 558–59 (1974); *Walter Kidde Constructors, Inc. v. State,* 37 Conn.Supp. 50, 434 A.2d 962, 977–78 (Ct.1981); *Eichleay Corp.,* ASBCA No. 5183, 60–2 B.C.A. (CCH) ¶ 2688 (1960)). In such instances it is not necessary to establish a specific amount, but only to determine a fair allocation for compensating the contractor (*Southern New England,* 345 A.2d at 559). Though several methods of computation have been used by the courts (*Eichleay,* 60–2 B.C.A. (CCH) ¶ 2688, at 13,-573–74, collecting cases), the most popular method has become known as the "Eichleay Formula." In its most basic form that formula—advanced by both Aircraft and Kaman as the appropriate calculation—entails a three-step process to determine the amount recoverable (*Capital Elec. Co. v. United States,* 729 F.2d 743, 747 (Fed.Cir.1984)):

$$\frac{\text{Contract Billings}}{\text{Total Billings for Contract Period}} \times \frac{\text{Total Overhead for Contract Period}}{} = \frac{\text{Overhead Allocable to Contract}}{}$$

$$\frac{\text{Allocable Overhead}}{\text{Days of Performance}} = \text{Daily Contract Overhead}$$

$$\text{Daily Contract Overhead} \times \text{Days Delay} = \text{Amount Recoverable}$$

■ To establish a prima facie case for recovery under the Eichleay Formula, a plaintiff must demonstrate (1) that there has been some compensable delay, resulting in such uncertainty that (2) plaintiff had to stand by during the delay, (3) incurring damages when it was unable to take on additional work (*Interstate Gen. Gov't Contractors, Inc. v. West,* 12 F.3d 1053, 1056 (Fed.Cir.1993); *C.B.C. Enter., Inc. v. United States,* 978 F.2d 669, 674 (Fed.Cir.1992)). That showing suffices to transfer to the party causing the delay the burden of going forward with proof that the contractor suffered no loss or should have suffered no loss (*Capital Elec.,* 729 F.2d at 746).

Even with all reasonable inferences drawn in Aircraft's favor, genuine issues of material fact remain as to *all three* Eichleay Formula elements. They will be ticked off in turn.

As to compensable delay, Kaman has offered evidence that Aircraft caused it to be delayed in its performance of the Navy contract (K. 12(n)(2) ¶ 110). Nowhere in its GR 12(m) statement or other submissions does Aircraft deny such delays on its part—in fact they are readily admitted (A. 12(m) ¶ 12). And Aircraft's attempts to excuse its contribution to the total delays have fallen short for the reasons already discussed in this opinion.

As for the "standby" requirement, *Interstate Gen.,* 12 F.3d at 1057 explains:

Properly understood, the "standby" test focuses not on the idleness of the contractor's work force (either assigned to the contract or total work force), but on suspension of work on the contract.[20]

---

20. [Footnote by this Court] *Williams Enter., Inc. v. Sherman R. Smoot Co.,* 938 F.2d 230, 235 (D.C.Cir.1991) teaches that there is no material distinction to be drawn between a work suspen-sion and a work extension for purposes of the Eichleay Formula:

It may be true that when a project is extended (not suspended), the work will be ongoing and

If the inquiry were otherwise, a contractor would be penalized for having mitigated its damages for *direct* costs by reassigning its employees to other jobs during the delay (*id.* at 1057 n. 4).

Aircraft claims that when Kaman sent its engineers who were otherwise idled by the delays to help in Aircraft's gear development effort, Kaman was not "standing by" on the Navy contracts and therefore may not now claim unabsorbed overhead. There are two obvious problems with that argument.

First, not *all* of the engineers were so gainfully employed. When Aircraft failed to deliver certain parts on schedule, Kaman claims to have performed as many out-of-sequence assembly operations as it could and then waited: "[W]ork on that aircraft stopped and workers were idled while Kaman awaited Aircraft Gear's deliveries" (K. 12(n)(2) ¶ 108). Because Aircraft does not address that issue, a question of material fact persists in any event.

Second, Aircraft's argument relies on an unrealistic "all-or-nothing" approach to recovery of unabsorbed overhead. Before a contractor may claim any unabsorbed overhead under the Eichleay Formula, it must attempt to mitigate its damages from delay by shifting resources to other projects (*E.C. Morris & Son, Inc.*, ASBCA No. 36,706, 91–2 B.C.A. (CCH) ¶ 23,778, at 119,088 (1991)).[21] Here Kaman mitigated its damages from Aircraft's delays by devoting additional resources *to assisting Aircraft*. Aircraft questions why Kaman failed to look for other projects instead, but Kaman offers a plausible justification for its focus on the Aircraft contracts alone: Its assembly line became so congested by partially completed aircraft that the efficiency of its operation was significantly reduced (A. 12(m) Ex. B at 15). That certainly supports the potential recovery of unabsorbed overhead, so long as Aircraft

does not have to pay twice for the same element of overhead.

Aircraft's fear of such double recovery is wholly unwarranted. To that end Kaman has reduced its claim for unabsorbed overhead by the overhead allocated to the direct costs associated with assisting Aircraft (A. 12(m) Ex. 23).[22] While Aircraft challenges such a reduction as a misuse of the Eichleay Formula, similar credits are commonly given in an analogous context for overhead paid in connection with change orders where those orders cause later compensable delays (see *A.A. Beiro Constr. Co.*, ENG B.C.A. No. 1503, 91–3 B.C.A. (CCH) ¶ 24,149, at 120,844 (1991); *J.D. Hedin Constr. Co. v. United States*, 171 Ct.Cl. 70, 347 F.2d 235, 259 (1965), overruled in an unrelated respect by *Wilner v. United States*, 24 F.3d 1397, 1402–03 (Fed.Cir.1994)).

As for the third element of the Eichleay Formula, a contractor is not simply entitled to stand by whenever a delay arises—rather the contractor must actually be *unable* to take on other work, so that the delay causes unavoidable damages. *C.B.C. Enter.*, 978 F.2d at 674 counsels that the key to this part of the inquiry is uncertainty:

> This same element of uncertainty, engendered by the fact of disruption, suspension or delay of contract performance, has been present whenever the courts or the Boards of Contract Appeals have permitted extended home office overhead to be calculated under the Eichleay Formula.

And uncertainty as to the length of delay necessarily makes it "impracticable" for a contractor to take on additional projects (*Interstate Gen.*, 12 F.3d at 1058):

> Assuming that the contractor has not reached his bonding capacity, uncertainty in duration of delays or suspensions can also adversely affect the contractor's abili-

---

thus income from the project will continue to be applied to home office overhead costs. On the other hand, when work is extended, the project income will be spread over a longer period of time and, consequently, less of the income may be allocated to home office overhead costs. Thus, an extended project—like a suspended project—may result in reduced income vis-a-vis overhead costs.

**21.** Aircraft admits as much when it argues that Kaman must show that it could not have shifted its labor forces to other work before it may recover (A. SJ Mem. 9).

**22.** Whether or not those direct costs are themselves recoverable is dealt with later in this opinion.

ty to absorb the overhead by taking on additional work during the delay periods, because at any given moment the contractor could be required to shift his resources to resume work on the stalled project.

Kaman has provided sufficient evidence of such uncertainty to create a genuine issue of material fact as to its failure to shift resources to other work. Kaman's submission supports its claim that Aircraft frequently promised imminent delivery of parts, only to deliver gearbox kits containing defective components (K. 12(n) Ex. V (Juri Martinson Aff.) ¶ 13):

> Kaman was unable to preserve and set aside the partially completed aircraft and fully reassign or furlough its workers because Aircraft Gear continually reassured Kaman that gearbox kits would be forthcoming in the immediate future. As a result of these assurances, Kaman remained in a constant state of readiness to proceed but was always uncertain about the gearbox delivery schedule.

And Kaman's claim of having stayed in such a state of readiness is supported by its ability to complete an aircraft assembly only 18 days after delivery of the necessary gearbox kit (K. 12(n)(2) Ex. U (Herbert Gewehr Aff.) ¶ 26). Aircraft does not controvert those assertions (which would have to be credited on the current motion even if they *were* contested), thus providing yet another independent basis on which this Court is compelled to deny Aircraft's summary judgment motion.

*Recovery of Damages as a Matter of Law*

■ Kaman claims that it is entitled to recover excess engineering, quality, travel, test and installation costs occasioned by Aircraft's failure timely to deliver gears conforming to the Purchase Orders' requirements. Though citing no law in opposition to those claims, Aircraft asserts vaguely that there is a "complete failure of proof" (A. SJ Mem. 12) that Kaman is entitled to recover these damages because no provision in the parties' contract specifically denotes them. In light of the generous standards afforded by Connecticut law, Aircraft's position succeeds only in trying this Court's patience.

As a threshold matter, the parties' contract specifies that Kaman's damages are *not* limited to those stated within its four corners (K. 12(m) Ex. K (Conditions of Purchase) ¶ 20):

> 20. CUMULATIVE RIGHT AND REMEDIES. The rights and remedies herein reserved to Kaman shall be cumulative and in addition to any other or further rights and remedies provided by law or equity.

■ And under Connecticut law Kaman is accorded wide latitude in the damages it may claim if it is able to establish a breach by Aircraft (*West Haven Sound Dev. Corp. v. West Haven*, 201 Conn. 305, 514 A.2d 734, 742 (1986)):

> It has traditionally been held that a party may recover "general" contract damages for any loss that "may fairly and reasonably be considered [as] arising naturally, i.e., according to the usual course of things, from such breach of contract itself."

Thus consequential damages that would have been reasonably foreseeable at the time of agreement are recoverable (*Boulevard Assoc. v. Sovereign Hotels, Inc.*, 861 F.Supp. 1132, 1136 (D.Conn.1994), applying Connecticut law).

Quoting earlier Connecticut case law, *Bachman v. Fortuna*, 145 Conn. 191, 141 A.2d 477, 478–79 (1958) (citations and internal quotation marks omitted) has set out the Connecticut contract law principles made relevant by Kaman's claims here:

> The general rule regarding breaches of contract, whether relating to real or personal estate, is that the injured party shall recover that compensation which will leave him as well off as he would have been had the contract been fully performed. . . . There is no unbending rule as to the evidence by which such compensation is to be determined. In some cases the sum which will furnish such compensation may properly be ascertained by evidence of the difference in the value of the property, upon which structures are to be placed or repairs are to be made, with and without such repairs or structures. But the object of the parties ought to be attained as nearly as possible; and that is, that the

specific act agreed to be done should be performed. If the party omits to do what he stipulated, it is just, as a reasonable substitute, that he should pay the precise value of the thing which he contracted to do; and such value to be estimated at the time when the act in question should have been executed. Such value may often properly be shown by proof of what it would cost to perform the omitted acts.

Accord, *Kevin Roche–John Dinkeloo & Assoc. v. City of New Haven*, 205 Conn. 741, 535 A.2d 1287, 1290–91 (1988).

 Before being awarded complete recovery, a plaintiff may be called upon to demonstrate that it took reasonable efforts to minimize the loss occasioned by the breach. Even so, only a reasonable effort is required (*Danpar Assoc. v. Somersville Mills Sales Room, Inc.*, 182 Conn. 444, 438 A.2d 708, 710 (1980); *West Haven Sound*, 514 A.2d at 748). And, having fulfilled its duty, the plaintiff-promisee is entitled to recover the costs of its efforts from the breaching party (*id.;* John Murray, Jr., *Murray on Contracts* § 122, at 702 (3d ed. 1990)).

In that jurisprudential context Kaman's damage claims are entirely appropriate. Kaman argues for excess travel costs to and from Aircraft Gear's shop only to the extent that such travel was the "natural and foreseeable result of Aircraft Gear's breach" (K. SJ Mem. 4). Excess test and installation costs are claimed as mitigation expenses— Kaman asserts that it tested damaged parts and installed substitute gears and experimental gearboxes into production aircraft when the proper parts failed to arrive on time (A. 12(m) Ex. B at 5, 6). Finally, Kaman seeks to recover excess engineering and quality costs made necessary by Aircraft Gear's failure to provide the proper Manufacturing Orders for the Pyrowear gears. Assuming that Kaman establishes a breach of

contract by Aircraft—a question that the Opinion did not reach—recovery of such costs might well be viewed by a jury as reasonably necessary to place Kaman in the position that it would have enjoyed had the contract been performed.[23]

### Damage Apportionment

Having failed to land safely with either of its two other contentions, Aircraft's final approach is to insist in its Rule 56 motion that Kaman has failed to suggest a reasonable basis for determining the amount of damages and, in so failing, has not demonstrated "the essential element of damages resulting from a breach of contract" (A. SJ 7). Because it is unclear whether that assertion is directed (1) at disputing causation for Kaman's damages (which *might* offer a complete defense) or (2) at challenging the calculation of the damages themselves (which would *not* be appropriate on this Rule 56 motion), this opinion will consider both those possibilities. And when struck with the barrage of adverse legal precedent on both issues, Aircraft crashes and burns.

Citing the 300 Engineering Orders claimed to have been directed by Kaman, Aircraft urges that this Court should bar Kaman's recovery by applying apply the rule most recently stated in *Wilner v. United States*, 994 F.2d 783, 786 (Fed.Cir.1993):

> Where both parties to a contract contribute to delay, neither can recover damages, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party.

That causation maxim does reflect the majority view among tribunals hearing public contract disputes (David James, *Concurrency and Apportioning Liability and Damages in Public Contract Adjudications*, 20 Pub. Cont.L.J. 490, 509 (1991)), though it has recently come under fire in some quarters as

---

**23.** Parenthetically, that same result would follow if this Court were to decide the same issues under the UCC (William Henning & George Wallach, *Law of Sales Under the Uniform Commercial Code* ¶ 10.05[3], at 10–42 (rev. ed. 1992) (footnotes omitted), collecting cases):

> A seller's breach, especially in cases where defective goods are delivered under the contract, often forces a buyer to incur added ex-

penses such as extra labor or repair costs, which would not have been incurred if the goods had conformed to the contract. These expenses are recoverable because they are not part of what the buyer agreed to give up under the terms of the contract. They enter the calculation either by being added to the expectation interest, or by increasing the lost-profit claim.

"archaic and arbitrary" (Rocky Unruh & John Worden, *Liquidated Damages for Delay in Completion of Commercial Construction Projects: Are They Recoverable by the Owner When the Owner Contributes to the Delay?*, 34 Santa Clara L.Rev. 1, 33 (1993)).

But the *Wilner*-repeated rule cannot shoulder the burden that Aircraft would have it carry. Nearly a half-century ago *E.J. Albrecht Co. v. New Amsterdam Casualty Co.*, 163 F.2d 16, 20 (7th Cir.1947) took note of one of the seminal cases establishing the rule and found it to stand for the unremarkable position "that a claim for damages will lie if there is (1) breach of contract, and (2) obstructive delay." Kaman has alleged both breach and delay in its Counterclaim (Counterclaim ¶¶ 12, 14). Furthermore, Kaman *has* proffered a clear apportionment of the delay and expense attributable to each party (see, e.g., A. 12(m) Ex. 2; *id.* Ex. 4). Aircraft's quarrel with those calculations merely creates a genuine issue of material fact, making summary judgment inappropriate (cf. *United States ex rel. Thorleif Larsen & Son, Inc. v. B.R. Abbot Constr. Co.*, 466 F.2d 712, 714 (7th Cir.1972)).

In response to Aircraft's causation argument, Kaman cites to *Southern New England Contracting*, 345 A.2d at 559, which states (citations and internal quotation marks omitted):

> There is no unbending rule as to the evidence by which damages are to be determined, but the object of the parties ought to be attained as nearly as possible. It is incumbent upon a plaintiff in a contract action to prove his damages with all the certainty which is reasonably possible, but where exactness is not possible he is not therefore to be precluded from a recovery, and the best approximation to certainty is all that is required.

In so doing Kaman passes Aircraft in the night without incident—in that case the Connecticut Supreme Court was clearly addressing the traditional standard for damage *calculation* and not for causation (see *Wunderlich Contracting Co. v. United States*, 351 F.2d 956, 968, 173 Ct.Cl. 180 (1965)).

But taken on its own terms, Kaman's argument is sound: Aircraft cannot hope to prevail on summary judgment just by challenging Kaman's calculation of damages. *Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1372–73 (7th Cir.1990) teaches that dismissal of a claim for failure to produce precise evidence from which a jury might determine breach-of-contract damages is inappropriate for two reasons. First, the victim of a contract breach may always recover nominal damages even if it proves a breach but no damages (*id.; Lar–Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 365 A.2d 1086, 1093 (1976)). Second and more to the point here, a plaintiff need not propose a specific damage figure to the jury—as *Olympia Hotels*, 908 F.2d at 1372, citing *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927), said:

> The essential thing is that the evidence enable the jury to come up with a figure that represents a reasonable estimate of the plaintiff's damages.

In those terms it is clear on the facts that Kaman's evidence as to damages, "while mainly circumstantial, was competent; and that it sufficiently showed the extent of the damages, as a matter of just and reasonable inference, to warrant the submission of this question to the jury" (*Eastman Kodak*, 273 U.S. at 379, 47 S.Ct. at 405). Travel costs that Kaman claims to have sustained due to Aircraft's breach have been tabulated on the basis of expense reports, adjusted downward on the basis of historical data from other projects for costs that Kaman would normally have incurred during the period absent the breach (A. 12(m) Ex. B at 2). Kaman's calculation of escalation costs that it incurred has been adjusted for cost overruns and then reduced in accordance with the proportion of the total delay said to have been caused by Aircraft (*id.* at 3–5; A. 12(m) Ex. 3; *id.* Ex. 6). Actual labor rates and overhead have been applied to the hours spent testing and installing parts due to delays (A. 12(m) Ex. B at 5–6). Engineering costs claimed to have been necessitated by Aircraft's failure to provide Manufacturing Orders have been compiled from 1990 and 1992 as they occurred, adjusted for what "normal" costs should have been on the basis of other projects and then

charged with overhead (*id.* at 7–9). "Quality costs," consisting of labor costs associated with review of discrepant gears, have been reduced by the projected values and charged with actual labor rates and overhead for the affected periods (*id.* at 10–13). Inefficiencies flowing from the tardy delivery of gears have been calculated by including costs for out-of-sequence assembly and inspection and by utilizing historical data from the early stages of *this project* (*id.* at 15–16). Finally, unabsorbed overhead has been calculated using the Eichleay Formula (*id.* at 17).

Kaman has thus amply demonstrated how the damages it claims to have suffered may be both apportioned and calculated. Aircraft's mere disagreement with Kaman's methods cannot support summary judgment in Aircraft's favor. Instead, such disagreement is simply another factor requiring that summary judgment be *denied.*

### *Conclusion*

Having been twice unsuccessful in resisting summary judgment dismissing its own claims (both initially and on reconsideration), Aircraft now belatedly petitions this Court for permission to amend the Complaint in which it originally set out those claims. In light of the factors that have been discussed at length in this opinion, leave to amend is properly denied as to everything except a claim that was not in existence at the time the original Complaint was filed—AC Count III. Aircraft's motion for summary judgment is also denied. This action is set for a status hearing at 9 a.m. February 15, 1995, at which point the parties should be prepared to discuss (1) any need for further discovery as to Kaman's Counterclaim and Aircraft's newly-asserted AC Count III claims and (2) all other scheduling looking to the disposition of this action through trial.